# In the
# United States Court of Appeals
## For the Seventh Circuit
————————

Nos. 06-4389, 07-1794, 07-2484

EXTRA EQUIPAMENTOS E EXPORTAÇÃO LTDA.,

*Plaintiff-Appellant,*

*v.*

CASE CORPORATION,

*Defendant-Appellee.*

————————

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 8591—**Blanche M. Manning**, *Judge.*

————————

ARGUED APRIL 1, 2008—DECIDED SEPTEMBER 3, 2008

————————

Before POSNER, RIPPLE, and ROVNER, *Circuit Judges.*

POSNER, *Circuit Judge.*   Extra, a Brazilian distributor, sued Case, a large U.S. manufacturer of farm and construction equipment, in the federal district court in Chicago, charging fraud. Jurisdiction was based on 28 U.S.C. § 1332(a)(2), because the suit was between a citizen of a state (Case) and citizens of a foreign country (Extra and its boss—the latter no longer a party). The law governing the substantive issues in the case is agreed to be that of Illinois.

The district judge dismissed the suit on the ground that Case Brasil & Cia—Case's wholly owned Brazilian subsidiary—was an indispensable party to the suit. Fed. R. Civ. P. 19(b). Extra appealed and we reversed, 361 F.3d 359 (7th Cir. 2004), and the case went back to the district court for discovery. Eventually Case moved for summary judgment, which was granted, and Extra appeals. It also appeals from the district court's order awarding costs to Case as the prevailing party.

In 1992 Case Brasil had hired Extra to distribute Case products in Brazil. In 1999 Extra sued Case Brasil in a Brazilian court, claiming that corrupt employees of the subsidiary had caused it to overcharge Extra. Later that year, a "Release of Claims and Settlement of Certain Obligations" (we'll call it the "release") was negotiated and signed in Illinois by Persio Briante, Extra's president, on behalf of Extra, and by James Sharman on behalf of Case Brasil. Sharman was a vice president of Case Corporation, not of Case Brasil; no one employed by the latter was present at the negotiation or signed the release.

The release ended the Brazilian litigation and provided among other things (most not pertinent to this case) that Case Brasil would seek no more than $2 million in past-due payments that it claimed Extra owed it under the 1992 distributorship contract. In exchange, Extra, besides agreeing to drop its suit against Case Brasil and also drop an objection it had lodged with Brazilian authorities to a merger that Case wanted to make, agreed to give Case information about the corrupt conduct of Case Brasil's employees that would enable Case to have them

removed (thus avoiding possible trouble with the Brazilian government) without the parent or the subsidiary incurring liability to the terminated employees.

The present suit, which Extra filed in 2001, charges that at the negotiation of the release Case's representative, Sharman, had promised that if Extra agreed to the release, Case Brasil would retain Extra as a Case Brasil distributor in good standing; that the promise was fraudulent because Case had no intention of fulfilling it; and that after the release was signed, Case Brasil, claiming not to be bound by the release because it hadn't authorized its parent to make it—indeed, contending that it had had no wind of the negotiations or of the signing of the release—terminated Extra's distributorship and refuses to recognize the $2 million limit in the release on its money claims. Thus, Extra charges, Case had "manipulated the corporate distinction between itself and Case Brasil" by falsely representing that the Case official who signed the release was authorized to sign on behalf of Case Brasil. Extra contends that as a result of the manipulation, Case obtained the benefits of the release without honoring either the obligations that the release placed on it or Sharman's oral promise to retain Extra as a Case Brasil distributor. Instead Case Brasil quickly terminated Extra as a distributor, precipitating a second Brazilian suit by Extra, in which Extra claimed that the termination violated the 1992 contract. The Brazilian courts agreed that there had been a breach of contract; but specific performance was refused and the Brazilian litigation is now in the damages-determination phase.

The district court's principal ground for dismissing the present suit is a provision in the release captioned "No Reliance On The Other Party." It states that "Both parties represent and warrant that in making this Release they are relying on their own judgment, belief and knowledge and the counsel of their attorneys of choice. The parties are not relying on representations or statements made by the other party or any person representing them except for the representations and warranties expressed in this Release." A claim of fraud requires proof that the victim of the fraud relied on the representations that he contends are fraudulent. E.g., *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 545 N.E.2d 672, 681 (Ill. 1989); *Vigortone AG Products, Inc. v. PM AG Products, Inc.*, 316 F.3d 641, 644-45 (7th Cir. 2002) (Illinois law). Otherwise he cannot have been hurt by the fraud. If reliance on the allegedly fraudulent statements that Sharman made to Briante in the negotiation of the release is negated by the no-reliance clause, Extra's fraud claim evaporates, as the district court ruled.

Drafters of contracts worry lest in the event of a dispute one of the parties ask the court to depart from the terms of the written contract on the ground that it is not the parties' entire agreement—there are additional terms to which they had agreed during the negotiations leading up to the making of the contract. If such a claim enabled the party making it to obtain a jury trial on the meaning of the contract, the contractual process would be riven by uncertainty. The law's response to this problem is the parol evidence rule, which, so far as bears on this case, forbids the introduction of evidence (whether oral or

written) of what was said in the process of negotiating a contract to vary the terms of the contract that resulted from the negotiation, provided the contract seems clear and complete. *A.W. Wendell & Sons, Inc. v. Qazi*, 626 N.E.2d 280, 287 (Ill. App. 1993); *Maas v. Board of Trustees of Community College District No. 529*, 418 N.E.2d 1029, 1042-44 (Ill. App. 1981); *Utica Mutual Ins. Co. v. Vigo Coal Co.*, 393 F.3d 707, 713-14 (7th Cir. 2004). The rule implements the parties' intention to "simplify the administration of the resulting contract and to facilitate the resolution of possible disputes by excluding from the scope of their agreement those matters that were raised and dropped or even agreed upon and superseded during the negotiations." 2 E. Allan Farnsworth, *Farnsworth on Contracts*, § 7.2, p. 224 (3d ed. 2004).

To make assurance doubly sure, parties to a written contract commonly include in it an "integration" clause; for if they do not, the party resisting the invocation of the parol evidence rule can ask the judge to consider extrinsic evidence bearing on the question whether the parties really did intend the written contract to be the complete and final articulation of their agreement. *Utica Mutual Ins. Co. v. Vigo Coal Co., supra*, 393 F.3d at 714. The parties did include an integration clause in the release. It states: "This Release constitutes the entire agreement between the parties, and this Release supersedes all prior negotiations and agreements between the parties relating to the subject of this Release." So evidence of what was said in the negotiations that led up to the signing of the release would not be admissible—in a suit for breach of contract.

That is a critical qualification. The parol evidence rule is a rule of contract law, and a contract integration clause is a privately negotiated supplement to the rule, and most courts, including, we have assumed (though the matter is not free from doubt), Illinois, hold that neither the rule nor the clause prevents a disappointed party to the contract from basing a tort suit on proof that in the course of the negotiations the other party made fraudulent representations. *Vigortone AG Products, Inc. v. PM AG Products, Inc., supra*, 316 F.3d at 643-44; *General Casualty Co. v. Carroll Tiling Service, Inc.*, 796 N.E.2d 702, 708-09 (Ill. App. 2003); *Pinken v. Frank*, 704 F.2d 1019, 1022-23 (8th Cir. 1983); 2 Farnsworth, *supra*, § 7.4, pp. 245, 247.

Granted, a suit for fraud is not a perfect substitute for a suit for breach of contract. There are additional pleading requirements, see, e.g., Fed. R. Civ. P. 9(b), and in Illinois fraud must be proved by clear and convincing evidence, and not just by a preponderance of the evidence, *Hofmann v. Hofmann*, 446 N.E.2d 499, 506 (Ill. 1983); *Williams v. Chicago Osteopathic Health Systems*, 654 N.E.2d 613, 619 (Ill. App. 1995); *Association Benefit Services, Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 852-53 (7th Cir. 2007) (Illinois law), which is all that is required to prove a breach of contract. Also, the statute of limitations is shorter in a tort suit than in a suit for breach of a written contract—five years rather than ten. 735 ILCS 5/13-205, -206; *LeBlang Motors, Ltd. v. Subaru of America, Inc.*, 148 F.3d 680, 690-91 (7th Cir. 1998) (Illinois law). On the other hand, punitive damages can be awarded in a suit for an intentional tort, such as fraud, but not (with rare exceptions, *Morrow v. L.A. Goldschmidt Associates, Inc.*, 492 N.E.2d 181, 183-86 (Ill.

1986); *Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Co.*, 313 F.3d 385, 389-91 (7th Cir. 2002) (Illinois law)) in a suit for breach of contract.

The tradeoffs are complex. But as this case, in which the claim of fraud is based on statements made in a negotiation that resulted in a contract, illustrates, a suit for fraud can be a device for trying to get around the limitations that the parol evidence rule and contract integration clauses place on efforts to vary a written contract on the basis of oral statements made in the negotiation phase. The release nowhere promises to retain Extra as a distributor of Case products; the fraud suit is based on an alleged oral promise to that effect—made en route to the signing of a contract (the release) that did not contain any such promise.

No-reliance clauses serve a legitimate purpose in closing a loophole in contract law (thus resisting, in Judge Kozinski's colorful expression, the metastasizing of contract law into tort law, *Oki America, Inc. v. Microtech Int'l, Inc.*, 872 F.2d 312, 315 (9th Cir. 1989)). They are, we have held, enforceable in Illinois, *Vigortone AG Products, Inc. v. PM AG Products, Inc., supra*, 316 F.3d at 644-45, as elsewhere. *Sundown, Inc. v. Pearson Real Estate Co.*, 8 P.3d 324, 331-32 (Wyo. 2000); *Haygood v. Burl Pounders Realty, Inc.*, 571 So. 2d 1086, 1088-89 (Ala. 1990); *Rissman v. Rissman*, 213 F.3d 381, 383-85 (7th Cir. 2000); *Manufacturers Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 315-18 (2d Cir. 1993); *First Financial Federal Savings & Loan Ass'n v. E.F. Hutton Mortgage Corp.*, 834 F.2d 685, 687-88 (8th Cir. 1987); *Landale Enterprises, Inc. v. Berry*, 676 F.2d 506, 507-08 (11th

Cir. 1982) (per curiam). But that is in general rather than in every case. The purpose of such a clause is to head off a suit for fraud, but the clause doesn't say that; it uses the anodyne term "reliance" and a lay person might not realize how much he was giving up by agreeing to the inclusion of the clause in his contract.

In the trade, no-reliance clauses are called "big boy" clauses (as in "we're big boys and can look after ourselves"). But if someone who is *not* a big boy—indeed is not even represented by counsel—signs a big-boy clause, there can be a problem, and this has led some courts to require, before such a clause can be enforced, an inquiry into the circumstances of its negotiation, to make sure that the signatory knew what he was doing. See *Brown v. Earthboard Sports USA, Inc*., 481 F.3d 901, 920-21 (6th Cir. 2007); *AES Corp. v. Dow Chemical Co*., 325 F.3d 174, 180-81 (3d Cir. 2003); see also *Rissman v. Rissman*, *supra*, 213 F.3d at 387-89 (concurring opinion). (The D.C. Circuit appears to be on both sides of the question. Compare *One-O-One Enterprises, Inc. v. Caruso*, 848 F.2d 1283, 1286-87 (D.C. Cir. 1988), with *Whelan v. Abell*, 48 F.3d 1247, 1258 (D.C. Cir. 1995).)

Whether Illinois would permit or require such an inquiry we do not know, but will assume an affirmative answer. It would not follow that the enforceability of such a clause could never be decided, as Extra seems to believe, without a trial. When no reasonable jury could find that the signatory did not understand the meaning of the no-reliance clause that he signed, the issue of enforceability can be resolved on summary judgment. *FMC*

*Technologies, Inc. v. Edwards*, 2007 WL 1725098, at *2-6 (W.D. Wash. June 12, 2007); see *Cozzi Iron & Metal, Inc. v. U.S. Office Equipment, Inc.*, 250 F.3d 570, 574 (7th Cir. 2001) (Illinois law); *MBIA Ins. Corp. v. Royal Indemnity Co.*, 426 F.3d 204, 214-19 (3d Cir. 2005). And that is the case here. Briante is the president of a very large company, and he was represented at the negotiation of the release by Brazilian and New York lawyers, all experienced in commercial transactions. Extra is a big boy and acted through counsel. It does not argue that its lawyers were unfamiliar with no-reliance clauses or failed to explain all the terms of the release to Briante, or that Case's representatives misrepresented the meaning of the no-reliance clause—that is not among the frauds alleged.

It argues instead that the representations that underlie its fraud claim were not "made by the other party"—that is, by Case Brasil—"or any person representing" it, as required by the no-reliance clause. Case Brasil was the other party, and Sharman, who signed for Case Brasil, is not employed by that company, but by Case Corporation. But we do not understand the relevance of who employed Sharman. Extra admits that Sharman represented at the negotiation that he was authorized to sign for Case Brasil, and it does not argue that this was a false representation. And Case admits that Sharman had at least apparent authority to bind Case Brasil. That must be right. He was the *only* signatory on Case Brasil's behalf, signing directly below the legend CASE BRASIL & CIA in the signing space of the release. If he had neither actual nor apparent authority to bind Case Brasil, the contract was not agreed to by one of its two parties and is therefore unen-

forceable. But Extra does not argue that it is unenforceable. It would like to have the benefit of that $2 million ceiling on money owed Case Brasil. If Extra sued to enforce the release, and Case Brasil defended on the ground that Sharman had lacked the authority to make a contract on Case Brasil's behalf, Extra would be indignant and the defense would be laughed out of court.

Extra is driven to argue that while Sharman was authorized to sign the release on behalf of Case Brasil, the representations that Extra is complaining about are representations that he made on behalf of Case rather than Case Brasil and therefore he was not speaking as a representative of the latter. This bit of wordplay does violence to the language of the no-reliance clause, which refers to representations by a party's representative—and Sharman was representing Case Brasil, a party (the only party, besides Extra). It is also unrealistic. Extra itself argues that in promising to retain Extra as a distributor, Sharman was trying to get Extra to sign the release so that *Case Brasil* could obtain at no cost evidence of corruption that would enable it to fire its misbehaving employees and thus avoid getting into trouble with the Brazilian government without incurring liability to them. If Sharman was lying, as Extra contends, he was lying on behalf of both his employer and the employer's wholly owned subsidiary—in which he had a special interest because he was in charge of Case's Latin American subsidiaries, which included Case Brasil.

So the no-release clause is valid and applicable. And if it weren't, that would not save the day for Extra. For its

suit is a suit for fraud, and the significance of the no-reliance clause, which does not depend on its enforceability in contract law, is that its language and the circumstances of its negotiation render Extra's reliance on Sharman's supposed oral misrepresentations unreasonable as a matter of law. The principle behind a no-reliance clause is, as this court explained in *Rissman v. Rissman*, *supra*, 213 F.3d at 384, "functionally the same as a doctrine long accepted in this circuit: that a person who has received written disclosure of the truth may not claim to rely on contrary oral falsehoods." Thus, whether a person reasonably appears to have authority to sign a contract on behalf of a party is a different question from whether a reasonable person would rely on such a person's representations. Had Sharman disclaimed authority to act on behalf of Case Brasil, how could Extra reasonably have relied on his oral representations about what Case Brasil would do? If Santa Claus had showed up at the bargaining table in place of Sharman, his absence of apparent authority to bind Case Brasil would not render Extra's reliance on his oral promises reasonable.

Notice too that the no-reliance clause refers to the "party's representative"—a term broader than apparent authority. A person may "represent" another without giving the impression that he has the authority to bind the person he represents—lawyers represent companies in mergers without having apparent authority to consummate the transaction.

Case's written disclosure in the no-reliance clause, in short, made Extra's reliance on oral representations

unreasonable no matter what Case's (or Sharman's) authority, actual or apparent, was vis-à-vis Case Brasil. If Case had authority, actual or apparent, then Extra was bound by the no-reliance clause; if Case didn't even have apparent authority, Extra was unreasonable in relying on its oral representations.

There is more that is wrong with Extra's suit. Extra's theory is that Sharman made oral misrepresentations in the negotiation in order to induce Extra to agree to the release. That sounds like a fraud designed to induce the victim to sign a contract; and the remedy for fraud in the inducement is to rescind the contract. *Tower Investors, LLC v. 111 East Chestnut Consultants, Inc.*, 864 N.E.2d 927, 939 (Ill. App. 2007); *Kochert v. Adagen Medical Int'l, Inc.*, 491 F.3d 674, 678-79 (7th Cir. 2007). But Extra is emphatic that it is not charging fraud in the inducement and has no desire to rescind the release. The fraud it charges is an oral promise—to retain it as a distributor for Case Brasil—that Case did not intend to honor. But what damages could it have incurred as a result of the fraud? It is not contending that it would be better off had it not been induced to sign the release. It complains about being terminated as a distributor. But that is the subject of its Brazilian suit for breach of the distributorship contract. It does not argue that the termination was more costly to it because of Sharman's promise not to terminate it.

So the suit was properly dismissed, and we move to the issue of costs. The district court awarded Case, as the winning party, some $116,000 in court costs. Rule 54(d) of the civil rules provided (when the costs were awarded

in this case—the rule now reads "costs—other than attorney's fees—should be allowed to the prevailing party," but the committee note explains that the change is only "stylistic") that the costs specified in 28 U.S.C. § 1920 "shall be allowed as of course to the prevailing party unless the court otherwise directs." Extra argues that the district court should have "otherwise direct[ed]," awarding no costs, to punish Case for not presenting its defense based on the no-reliance clause until almost five years after Extra filed this suit. The argument is frivolous. The process for awarding court costs is intended to be summary. Extra wants to turn it into an inquest on the winning party's litigation strategy. Should Case have filed a motion to dismiss based on the no-reliance clause? Should it have filed its motion for summary judgment earlier? Did it need discovery in order to establish the enforceability and applicability of the no-release clause? Was it a foot-dragging defendant? These are not issues that a district court should have to resolve in order to decide whether a tiny fraction of the expenses of a protracted litigation, now almost seven years old, should be shifted from the losing to the winning party.

Extra also complains about two of the cost items—court-reporter attendance fees of some $8,700 and translation fees of almost $76,000—that the judge awarded. The first complaint has no merit. The statute authorizes the award as costs of "fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case." 28 U.S.C. § 1920(2). Some reporters charge a separate fee for attending the trial or hearing that they make a stenographic transcript of; others roll that

fee into the fee for the transcript itself. Since the reporter cannot make the transcript without attending the hearing, the separate attendance fee is properly regarded as a component of the fee for the transcript. *Held v. Held*, 137 F.3d 998, 1002 (7th Cir. 1998); *Finchum v. Ford Motor Co.*, 57 F.3d 526, 534 (7th Cir. 1995); *Arrambide v. Wal-Mart Stores, Inc.*, 33 Fed. Appx. 199, 203 (6th Cir. 2002) (per curiam).

There is greater merit to Extra's complaint about the award of translation fees. The statute refers to "compensation of court appointed experts, *compensation of interpreters*, and salaries, fees, expenses and costs of special interpretation services under [28 U.S.C. § 1828]." 28 U.S.C. § 1920(6) (emphasis added). (Section 1828 creates a program for the provision of interpretation services in federal criminal and habeas corpus proceedings.) The specificity of section 1920(6), and the character of section 1920 as a whole, makes us reluctant to interpret "interpreters" loosely to include translators of written documents, in this case the exhibits presented by Case at depositions and in support of its motion for summary judgment, and also the exhibits on its list of proposed trial exhibits. An interpreter as normally understood is a person who translates living speech from one language to another. He is a type of translator, see, e.g., *Yu Cong Eng v. Trinidad*, 271 U.S. 500, 508-09 (1926); *Gjerazi v. Gonzales*, 435 F.3d 800, 807 (7th Cir. 2006); *Ememe v. Ashcroft*, 358 F.3d 446, 448 (7th Cir. 2004), but the translator of a document is not referred to as an interpreter. Robert Fagles made famous translations into English of the *Iliad*, the *Odyssey*, and the *Aeneid*, but no one would refer to him as an English-language "interpreter" of these works.

We are mindful that the Sixth Circuit in *BDT Products, Inc. v. Lexmark Int'l, Inc.*, 405 F.3d 415, 419 (6th Cir. 2005), held that the statute allows the award of costs for translating documents. (Other decisions have allowed such awards, but *BDT* is the only reported appellate decision that we have found in which the meaning of the statute was placed in question.) The only reason the court gave was that "the definition of interpret expressly includes to 'translate into intelligible or familiar language.' Webster's Third New International Dictionary 1182 (1981)." But the statutory term is "interpreters," not "interpret." The same dictionary defines "interpreter" (so far as might relate to the statute) as "one that translates; *esp*: a person who translates orally for persons who are conversing in different tongues." *Id*. The qualification in "especially" leaves open the possibility that an interpretation can sometimes be of a document. And indeed it can be: a judge interprets statutes, and might sometimes (though rarely) be referred to as a statutory interpreter. But he is not a translator. If a judge translated the French Code of Criminal Procedure into English, we would not say that he had "interpreted" the French code into English.

There are plenty of loose interpretations; so we do not wish to deny the possibility of stretching section 1920 as far as urged by Case. But it would be a stretch, and there should be a good reason for disfiguring statutory language before wielding the knife, and there is not here. We cannot find a "spirit" in section 1920 that might guide an interpretation unmoored from the statutory language. The items allowable as costs are a hodgepodge. There is no purposive explanation for why some items are in and others out. To include translation fees

would simply complicate the process of awarding court costs—the concern that underlies our rejection of Extra's attempt to avoid having to pay costs on the basis of Case's alleged "unreasonable delay" in interposing its determinative defense to Extra's suit. For while there is a natural limit to the expense of interpreters—the amount of time that witnesses (including deponents) undergo live examination—there is no natural limit on the number of documents that can be translated in aid of a claim or defense. A suit of the magnitude of Extra's suit (remember, it's almost seven years old) can generate millions of pages of documents. A large fraction of the documents in this case are in Portuguese, not to mention the countless pages of Brazilian statutes and cases that might be relevant to the litigation. It is ominous that 65 percent of the costs awarded in this case were for translation, and of that amount only 11 percent was for interpretation. Was all that translation of written documents necessary? We do not think a district judge should be required to wade into such issues without a clearer directive from Congress. (Because this ruling creates a conflict with another circuit, we have circulated the opinion, in advance of issuance, to the entire court under 7th Cir. R. 40(e). No judge voted to hear the case en banc; Judge Flaum did not participate in the consideration of the matter.)

To summarize, the judgment for the defendant on the merits is affirmed. The award of costs is affirmed in part and reversed in part, and the matter of costs is remanded to the district court for redetermination.

AFFIRMED IN PART, REVERSED IN PART,
AND REMANDED.

RIPPLE, *Circuit Judge*, concurring in part and dissenting in part. The district court granted summary judgment in favor of Case with respect to both Extra's fraud and promissory fraud claims. The panel majority affirms the district court with respect to both counts. I join the panel majority's determination that the district court properly dismissed Extra's fraud claim. With respect to Extra's promissory fraud count, however, I would reverse the judgment of the district court and remand the case for trial.

## I

### A.

In this diversity action, Extra Equipamentos E Exportação, Ltda. ("Extra") asserts claims of fraud and promissory fraud against Case Corporation ("Case"). Case is a manufacturer of farm and construction equipment; Case Brasil is a wholly owned subsidiary of Case organized under the laws of Brazil. From 1992 until 2001, Extra operated as a distributor of Case equipment under a distribution agreement with Case Brasil (the "1992 distribution agreement").

In 1999, Case began having serious concerns about the allegedly illegal or improper conduct of executives at Case Brasil. From 1997 until 1999, Mario Hirose allegedly had been operating a "charge-back" scheme[1] to inflate both

---

[1] The scheme operated as follows: Extra and other distributors had open accounts with Case Brasil that reflected the amounts owed by one entity to the other. As part of the scheme, Case

(continued...)

Case Brasil's profits and the bonuses of Case Brasil's management; Hirose also allegedly was extorting from Persio Briante, Extra's owner and president, R$50,000 per month as a condition for continuing the 1992 distribution agreement. Although Case became aware of, and was investigating, the alleged corruption at Case Brasil, it was unable to garner sufficient evidence to terminate Hirose and his corrupt colleagues. In 1999, based on Hirose's corrupt conduct, Extra sued Case Brasil in Brazilian court.

At the same time that it was investigating Case Brasil executives, Case also was seeking to have a proposed merger approved by CADE, a Brazilian agency with the regulatory authority to approve business mergers. Extra had filed objections to the merger. Case was aware of these objections; indeed, at one time, Case executives met with Briante and his counsel regarding these objections. Briante's lawyer informed Brian Cahill, a senior in-house counsel at Case, that Briante was most concerned about alleged improper charge-backs to Extra's open account and that the CADE objections were filed to get Case's attention.

---

[1] (...continued)
Brasil would approve farm equipment loans for customers whom they knew could not pay off the loans. Whenever a customer defaulted on such a loan, Case Brasil's management would transfer these loans from Case Brasil's books to the open accounts kept with distributors like Extra. This resulted in losses to the distributor as well as a windfall to Case Brasil's management because it enabled management to inflate improperly their bonuses based on false sales figures.

Cahill met with Briante in October 1999. On behalf of Case, Cahill had three issues to discuss: (1) additional information needed to fire Hirose and his associates; (2) objections to the pending merger; and (3) the charge-back issue. The parties could not resolve these issues; later, however, Briante's lawyer called Cahill to indicate Briante's interest in another meeting and also to express concern for Briante's safety if he should meet with Case people again in Brazil. It was therefore agreed that Briante would fly to the United States and would meet with Case management in an airplane hangar at an airport in Waukegan, Illinois.

The parties met in Waukegan. Extra was represented by Briante, who had with him Extra's Brazilian and American attorneys as well as Extra's financial advisor. Case was represented by James Sharman, Cahill and William Dietrick, a Case outside attorney. Sharman introduced himself as a Case Vice-President and head of Case's Latin American operations. It is undisputed that Sharman is not an officer of Case Brasil. Cahill testified in a deposition that he did not inform Extra's representatives that Sharman was not an officer of Case Brasil.

After a full day of negotiations, the parties reached an agreement (the "Release"). The Release recites that it is between Extra and Case Brasil; James Sharman signed the Release on behalf of Case Brasil. Throughout this litigation, moreover, Case has maintained that the "actual party" to the Release was Case Brasil. R.173 at 1-2.

The Release contains a no-reliance clause:

> No Reliance On The Other Party: Both parties represent and warrant that in making this Release they

are relying on their own judgment, belief and knowledge and the counsel of their attorneys of choice. The parties are not relying on representations or statements made by the other party or any person representing them except for the representations and warranties expressed in this Release.

R.157, Ex. 9 at 5-6. Under the terms of the Release, Case was assured of Briante's full cooperation and support in rectifying Case's problems with its Brazilian operations. Case Brasil, for its part, assured that it would provide to Extra a "standard" Case "Commercial Representative Agreement and Technical Services Agreement." *Id.*, Ex. 9 at 1. With respect to the charge-back issue, Case Brasil agreed to cap at R$2 million the total amount of monies that Extra owed to Case Brasil. In exchange, Extra dropped the suit that it had instituted in 1999 in Brazilian courts. Additionally, Extra released all claims that it might have had against Case Brasil, including any claims regarding the charge-back scheme, Hirose's alleged extortion and objections to Case Brasil's then-pending merger.

Extra, in compliance with the terms of the Release, provided Case with information about the operations of Case Brasil, namely that Hirose was extorting money or other favors from Case dealers, which allowed Case to terminate Hirose's employment. Indeed, Sharman and Cahill flew to Brazil the following day to fire Hirose; other Case officials fired Hirose's staff.

At this point in the litigation, the record does not permit a definitive determination as to the extent to which Case

Brasil failed to comply with the Release or whether Case Brasil repudiated the contract. According to Extra, Case Brasil has ignored, almost completely, its obligations under the Release by failing to tender proper Commercial Representative and Technical Services agreements to Extra. Case Brasil officers called the Release "stupid" and said that it "made no sense at all." In 2001, moreover, Case Brasil attempted to force Extra into signing a novation that would have released Case Brasil from its obligations under the Release. In that document, Case Brasil asked Extra to recognize a debt of R$10,365,000, despite the R$2 million cap set in the Release. After Extra refused to sign the novation, Case Brasil terminated Extra's line of credit and refused to sell to Extra any spare parts of Case equipment. Case Brasil informed Extra that Extra's credit would be restored if Extra signed the novation. According to Extra, Case Brasil executives repeatedly demanded that Extra desist from attempting to enforce the terms of the Waukegan agreement and threatened Extra's position as a distributor of Case equipment if Extra did not comply with Case Brasil's demands.

Case, in contrast, contends that Case Brasil has performed fully and that termination of the 1992 distribution agreement was permissible under the terms of the distribution agreement itself and occurred only after negotiations to extend the agreement (through Case's tendering of the Commercial Representative and Technical Services agreements to Extra) had failed. In any event, Case contends, after Case Brasil's perceived breach of the 1992 distribution agreement, Extra sued Case Brasil in Brazil for wrongful termination; Brazil's highest court held that

Case Brasil could terminate, although it might owe Extra some damages. This issue still is being litigated in Brazilian courts.

**B.**

Extra asserts claims of fraud and promissory fraud against Case. In our previous disposition in this case, we reversed the judgment of the district court, which had dismissed Extra's suit on the ground that Case Brasil was an indispensable party to the suit,[2] and remanded the case for further proceedings. *See Extra Equipamentos E Exportação v. Case Corp.*, 361 F.3d 359 (7th Cir. 2004) [herein-after *Extra I*]. In reversing the judgment of the district court, we noted repeatedly that Extra's suit was based on Case's alleged fraud in negotiating the Release. *See id.* at 360-61, 362-63. Specifically, we noted that Extra was contending that Case had manipulated its corporate form to dupe Extra into signing the Release while concomi-tantly preserving Case Brasil's ability to repudiate the Release. *Id.* On remand, the district court denied Case's motion to dismiss. After the parties had conducted dis-covery, Case filed a motion for summary judgment.

The district court granted summary judgment on all claims based on the Release's no-reliance clause and on this court's decision in *Rissman v. Rissman*, 213 F.3d 381, 383-84

---

[2] *See* Fed. R. Civ. P. 19. *See generally Republic of Philippines v. Pimentel*, 128 S. Ct. 2180, 2184-85, 2188 (2008) (discussing changes to the 2007 amendments to Rule 19).

(7th Cir. 2000).[3] In this case, the district court explained that *Rissman* applied only with "limited value" because a no-reliance clause "is typically a shield one party uses to deflect the opposing party's claims of fraud." R.174 at 8. Although the district court recognized that Case is not a party to the Release, which was between Case Brasil and Extra, it believed that "the non-reliance clause [nevertheless] bears on the critical issue" whether "Extra's reliance on Case's oral representations [was] reasonable[.]" *Id.* The court ruled that Extra's reliance on Case's representations was not reasonable, as a matter of law. In support of this determination, the district court explained that, when Extra met with Case to negotiate the Release, Extra was "under the impression" that Sharman was representing Case Brasil because both Sharman and Cahill had said so. As a result, Sharman was "any person representing" the parties, under the terms of the no-reliance clause. Under Illinois law, both fraud and promissory fraud require proof of reliance. Consequently, the district court dismissed both the fraud and the promissory fraud claim.

As relevant here, Case also had moved, in the alternative, for summary judgment with respect to Extra's promis-

---

[3] In *Rissman v. Rissman,* 213 F.3d 381, 383-84 (7th Cir. 2000), we held that "a written anti-reliance clause precludes any claim of deceit by prior representations." S*ee also id.* at 388-89 (Rovner, J., concurring) (noting that this is not a per se rule and that courts should continue to apply a totality of the circumstances approach).

sory fraud[4] claim on the ground that Extra had no evidence of a scheme to defraud. The district court rejected this alternative basis for granting summary judgment. It concluded that "Extra has offered evidence to support its allegations of a scheme to defraud." *Id.* at 12. Specifically, the district court noted that

> according to Extra's owner, Persio Briante, as soon as Case got the information it wanted from Extra, it reneged on its various agreements. Specifically, Case failed to stop Case Brasil from terminating the distribution agreement with Extra. Briante also contends that Case allowed Case Brasil to pressure Extra into forfeiting either the $2 million cap on Case Brasil's liability or risk Case Brasil terminating the distribution agreement (which Case Brasil eventually did). Evi-

---

[4]  Under Illinois law, a plaintiff may prove promissory fraud by establishing all of the elements of fraud and, additionally, by establishing that the false statement concerns future conduct rather than an existing or preexisting material fact and that the false statement of future conduct is part of a pattern or scheme to defraud. *Steinberg v. Chi. Med. Sch.*, 371 N.E.2d 634, 640-41 (Ill. 1977). The elements of fraud are: (1) the defendant made a false statement of material fact; (2) the defendant knew or believed that the statements were false, or the statements were made with a reckless disregard of whether they were true or false; (3) the statements were made with the intent to induce action; (4) the plaintiff reasonably believed the statements and justifiably acted in reliance on those statements; and (5) the plaintiff suffered damages as a result. *Kapelanski v. Johnson*, 390 F.3d 525, 530 (7th Cir. 2004) (Illinois law).

dence of a series of broken promises, even if the promises are all related, is sufficient to prove a scheme to defraud.

*Id.* at 12-13.

Finally, the district court also declined to grant summary judgment with respect to the promissory fraud claim on the alternative ground that Extra could not establish proximate causation between Case's alleged misrepresentation and Extra's damages. *Id.* at 13-14.

## II

### A.

Extra contends that Case Brasil's promises as set forth in the Release (that Case Brasil would provide a commercial representative agreement to renew the 1992 distribution agreement and that it would cap Extra's liability for the charge-backs at R$2 million) were, as we explained in our previous opinion, the "bait dangled before Extra to persuade it" to provide evidence of Hirose's fraud and extortion, dismissing its then-pending Brazilian suit, releasing any future claims that it might bring against Case Brasil, and dropping its objections to Case Brasil's proposed merger. *Extra I*, 361 F.3d at 363. Indeed, as we explained in our prior opinion, Extra's theory of the case is that "Case . . . manipulated the corporate distinction between itself and Case Brasil by falsely representing that the Case official who signed the agreement [Sharman] was authorized to sign on behalf of Case Brasil." *Id.* at 360 (emphasis supplied) (internal quotation marks omitted).

The panel majority's application of the no-reliance clause simply ignores Extra's promissory fraud theory. Under Illinois law, *as a general matter*, "misrepresentations of intention to perform future conduct, even if made without a present intention to perform, do not generally constitute fraud." *HPI Health Care Servs. v. Mount Vernon Hosp., Inc.*, 545 N.E.2d 672, 682 (Ill. 1989). Illinois courts, however, have "recognized an exception to this rule," under which "such promises are actionable if 'the false promise or representation of future conduct is alleged to be the scheme employed to accomplish the fraud.'" *Id.* (quoting *Steinberg v. Chi. Med. Sch.*, 371 N.E.2d 634, 641 (Ill. 1977)); *see also Desnick v. Am. Broadcasting Cos., Inc.*, 44 F.3d 1345, 1354 (7th Cir. 1995) ("Unlike most states nowadays, Illinois does not provide a remedy for fraudulent promises ('promissory fraud')—*unless they are part of a 'scheme' to defraud*." (emphasis added)). Accordingly, a promissory fraud action, under Illinois law, requires that a plaintiff prove that (1) the defendant made a false and material statement concerning future conduct; (2) as part of a scheme to defraud; (3) knowing that the statements were false, or the statements were made with a reckless disregard of whether they were true or false; (4) the statements were made with the intent to induce action; (5) the plaintiff reasonably believed the statements and justifiably acted in reliance on those statements; (6) the plaintiff suffered damages as a result. *Kapelanski v. Johnson*, 390 F.3d 525, 530 (7th Cir. 2004) (Illinois law); *Steinberg*, 371 N.E.2d at 641.

Based on the no-reliance clause, the district court granted summary judgment to Case with respect to both Extra's

fraud and promissory fraud claims. The no-reliance clause, the district court determined, would prevent Extra, as a matter of law, from proving reliance, which is an element of both fraud and promissory fraud.

The district court erred, however, in dismissing Extra's promissory fraud claim on the basis of the no-reliance clause. Many of the fraudulent statements upon which Extra has predicated this suit are repeated and reenforced in the Release itself, and, *by its own terms*, the no-reliance clause does not apply to "representations and warranties expressed in" the Release. R.157, Ex. 9 at 5-6. For example, the Release specifically contains the following terms: Before October 1999, Case Brasil promises to provide to Extra standard Case Commercial Representative and Technical Services agreements; Case Brasil promises that any charge-backs made by Case Brasil against Extra's open account would be reversed; and Case Brasil promises that it will cap Extra's liabilities at R$2 million. R.157, Ex. 9. Because Extra's promissory fraud claim is predicated upon the "representations and warranties expressed in" the Release itself, the no-reliance clause, by its plain language, cannot prevent Extra from establishing reliance as a matter of law on that claim. R.157, Ex. 9 at 5-6.

In addition to adhering to the plain language of the no-reliance clause, this result is consistent with the policy justifications for strictly enforcing such clauses. By memorializing conclusively the terms governing a transaction, no-reliance clauses mitigate the risks of skullduggery and faulty memory. *Rissman*, 213 F.3d at 384. It allows the parties to "ensure[] that both the transaction and any

subsequent litigation proceed on the basis of the parties' writings." *Id.* As the court in *Rissman* recognized, where a party has incorporated allegedly fraudulent terms into the agreement, these concerns are not implicated. *Rissman*, 213 F.3d at 383 (noting that the plaintiff who was suing for fraud did not contend that any misrepresentation in the agreement itself was untrue or misleading).

In sum, the panel majority's application of the no-reliance clause does not take into account Extra's promissory fraud claim. Extra claims that Case, as part of a scheme to defraud, has manipulated its corporate form—that is, the distinction between it and its subsidiary, Case Brasil—to dupe Extra into signing the Release and divulging information that Case needed while concomitantly scheming to ensure that Extra would not obtain the benefits of the Release. Having obtained from Extra the requisite information to fire Hirose and his corrupt associates as well as a blanket release of all claims, Case failed to ensure that Case Brasil follow the terms of the Release. The no-reliance clause cannot prevent Extra from proving reliance, as a matter of law, with respect to its promissory fraud claim.

The panel majority's opinion further obscures the importance of the foregoing analysis by faulting Extra for maintaining that it is seeking damages rather than rescission. *Supra* at 12. Extra's complaint and the Release itself, however, elucidate why Extra did not seek rescission as a remedy. As Illinois law recognizes, rescission of the Release cannot not place Extra in the *status quo ante* because the consideration that it tendered to Case

cannot be recovered. *See, e.g.*, *Klucznik v. Nikitopoulos*, 503 N.E.2d 1147, 1150 (Ill. App. Ct. 1987) ("[A] court will not grant rescission of a contract in any event where the *status quo ante* of the parties cannot be restored."); *see also Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Int'l, Ltd.*, 1 F.3d 639, 641 (7th Cir. 1993) ("A successful rescission action annuls the contract and returns the parties to the status quo ante."). As consideration for Case's (allegedly unfulfilled) promises set forth in the Release, Extra released *all* claims against Case Brasil, including the suit that it had instituted in 1999 regarding Case Brasil's charge-back scheme; the Release might also encompass any claims that Extra may have had for Hirose's extortion of Extra and Mr. Briante. Rescission would mean little to Extra if the Brazilian statute of limitations has expired or an equivalent to our laches doctrine prevents Extra from suing on these claims. Similarly, only damages can recompense Extra for the lost opportunity that it allegedly suffered when it agreed to divulge to Case information regarding Hirose and Case Brasil's corruption and to drop its objections to Case's then-pending merger. Rescission, in short, is "simply not feasible" in this case. *Jones v. InfoCure Corp.*, 310 F.3d 529, 535 (7th Cir. 2002) (internal quotation marks and citation omitted).

**B.**

As discussed above, Illinois law requires that Extra, to win its promissory fraud claim, establish that Case engaged in a scheme to defraud. In discussing Illinois law, we

have noted that "the distinction between a mere promissory fraud and a scheme of promissory fraud is elusive, and has caused, to say the least, considerable uncertainty, as even the Illinois cases acknowledge." *Desnick*, 44 F.3d at 1354. Despite this uncertainty, we continued, "it is not our proper role as a federal court in a diversity suit to read 'scheme' out of Illinois law; we must give it some meaning." *Id.* We concluded: "Our best interpretation is that promissory fraud is actionable only if it either is particularly egregious or, what may amount to the same thing, it is embedded in a larger pattern of deceptions or enticements that reasonably induces reliance and against which the law ought to provide a remedy." *Id.*

The district court rejected Case's claim that it was entitled to summary judgment based on Extra's failure to proffer evidence with respect to this element of the promissory fraud claim. The district court believed that Extra has alleged sufficient evidence to create a genuine issue of material fact as to whether Case engaged in a scheme to defraud. According to Extra, Case reneged on various provisions of the Release as soon as it received the information that it sought from Extra. Moreover, Case allowed Case Brasil to ignore, almost completely, its obligations under the Release by failing to tender proper Commercial Representative and Technical Services agreements to Extra. Case Brasil officers called the Release "stupid" and said that it "made no sense at all." In 2001, Case Brasil attempted to force Extra into signing a novation that would have excused Case Brasil from its obligations under the Release. In that document, Case Brasil asked Extra to recognize a debt of R$10,365,000, despite the R$2 million cap set in the Release.

After Extra refused to sign the novation, Case Brasil terminated Extra's line of credit and refused to sell to Extra any spare parts of Case equipment. Case Brasil informed Extra that Extra's credit would be restored if Extra signed the novation. According to Extra, Case Brasil executives repeatedly demanded that Extra desist from attempting to enforce the terms of the Waukegan agreement and threatened Extra's position as a distributor of Case equipment if Extra did not comply with Case Brasil's demands.

Whether Extra has adduced sufficient evidence that Case engaged in a scheme to defraud is a close issue. Given that this action is before us on summary judgment and given that, contrary to Case's suggestions, the parties are disputing vigorously whether Case was complicit in Case Brasil's (alleged) failure to comply with the Waukegan agreement, Extra should be allowed to proceed with its promissory fraud claim. Extra has adduced sufficient evidence to allow a jury to conclude that Case engaged in a scheme with Case Brasil to dupe Extra into signing the Release and divulging the information that Case needed while concomitantly scheming to ensure that Extra would not obtain the benefits of the Release.

## Conclusion

For the foregoing reasons, I would reverse the judgment of the district court with respect to Extra's promissory fraud claim and remand for a jury trial on that issue.