In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-2523

NIGHTINGALE HOME HEALTHCARE, INC.,

*Plaintiff-Appellant,*

*v.*

ANODYNE THERAPY, LLC,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:06-CV-01435-SEB-DML—**Sarah Evans Barker**, *Judge.*

ARGUED NOVEMBER 6, 2009—DECIDED DECEMBER 21, 2009

Before POSNER, KANNE, and ROVNER, *Circuit Judges.*

POSNER, *Circuit Judge.* The plaintiff appeals from an adverse judgment in what began as a diversity suit, but is most securely within federal jurisdiction if recharacterized as a federal-question suit in which the plaintiff's state-law claims are within the federal courts' supplemental jurisdiction. 28 U.S.C. § 1367. The reason for this convoluted approach to jurisdiction is that there is serious doubt (as we'll see) whether the plaintiff ever

had a good-faith basis for claiming damages in excess of $75,000, the jurisdictional minimum for a diversity case. The suit was filed in an Indiana state court in 2006, and the following year, after the defendant had removed the case to the federal district court on the ground that the case was within the diversity jurisdiction, the plaintiff filed an amended complaint adding a claim under the Lanham Act. The judge dismissed that claim on summary judgment, and the plaintiff does not challenge that ruling on appeal.

Even if the suit was improperly removed, and should have been dismissed for failure to satisfy the jurisdictional minimum, the plaintiff could have refiled the suit in the district court; its Lanham Act claim furnished a secure basis for federal jurisdiction. (There is no contention that the statute of limitations would have barred the refiled suit.) But probably the judge would have relinquished jurisdiction over the state-law claims (of which the only one pressed in the appeal is a claim of fraud under Indiana law) to the Indiana state courts; that is the usual sequel to the dismissal before trial of the claim on which federal jurisdiction is based. 28 U.S.C. § 1367(c)(3); *Carlsbad Technology, Inc. v. HIF Bio, Inc.*, 129 S. Ct. 1862, 1865 (2009); *Leister v. Dovetail, Inc.,* 546 F.3d 875, 882 (7th Cir. 2008); *Musson Theatrical, Inc. v. Federal Express Corp.*, 89 F.3d 1244, 1254-57 (6th Cir. 1996). The judge did not do this, probably because no one had questioned that the case was within the diversity jurisdiction. Instead she retained jurisdiction and granted summary judgment in favor of the defendant.

A district court is not *required* to relinquish jurisdiction over supplemental state-law claims just because it has dismissed the federal claim before trial. The decision whether to relinquish or retain is committed to the district judge's discretion. 28 U.S. C. § 1367(c)(3); *City of Chicago v. International College of Surgeons*, 522 U.S. 156, 173 (1997). For examples of cases in which jurisdiction was properly retained despite the dismissal of the federal claim before trial, see *Khan v. State Oil Co.*, 93 F.3d 1358, 1366 (7th Cir. 1996), vacated on other grounds by 522 U.S. 3 (1997); *Timm v. Mead Corp.*, 32 F.3d 273, 276-77 (7th Cir. 1994); *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 55-57 (2d Cir. 2004); cf. *Hansen v. Board of Trustees*, 551 F.3d 599, 608-09 (7th Cir. 2008). But if as in this case the district court retains jurisdiction because it mistakenly believes that the claims, rather than being supplemental, are within the diversity jurisdiction, the retention cannot be defended as an exercise of discretion. It is an abuse of discretion not to exercise discretion. *Miami Nation of Indians of Indiana, Inc. v. U.S. Dept. of Interior*, 255 F.3d 342, 350 (7th Cir. 2001); *Lemons v. Skidmore*, 985 F.2d 354, 358 (7th Cir. 1993); *Miller v. Hambrick*, 905 F.2d 259, 262 (9th Cir. 1990); *Vinci v. Consolidated Rail Corp.*, 927 F.2d 287, 288 (6th Cir. 1991) (per curiam). But since the state-law claims in this case have been litigated, and neither side is arguing for relinquishment, judicial economy counsels us to retain jurisdiction of the claims and decide the merits of the appeal, as in *Khan v. State Oil Co.*, *supra*, 93 F.3d at 1366, and *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1182 (7th Cir. 1993), even if the case is not within the diversity jurisdiction.

Anodyne, the defendant, sells an infrared lamp designed to relieve pain and improve circulation. It sold several of the lamps to the plaintiff, Nightingale, a provider of home healthcare services, at $6,000 per device. Nightingale complains that Anodyne's sales representative told it the device had been approved by the Food and Drug Administration for the treatment of peripheral neuropathy, a condition involving numbness and tingling in the extremities, caused by diabetes and other diseases. Anodyne denies that its sales representative had made such a representation—he had, according to Anodyne, represented that the device was FDA-approved and that it was intended for the treatment of peripheral neuropathy, but not that the FDA had approved it *for that purpose*. The district judge did not attempt to resolve the dispute over the representation, but instead based dismissal of the fraud claim on a disclaimer of warranties in Anodyne's contract with Nightingale and on Nightingale's failure to present any evidence of damages from the alleged fraud.

Anodyne had obtained the FDA's approval for the marketing of the device on the representation that it was intended for the treatment of minor muscle and joint pain and the improvement of "superficial circulation" (the circulation of blood near the surface of the body), but had marketed the device as a treatment for peripheral neuropathy. Had it said that the device provides relief for symptoms of peripheral neuropathy, it would have avoided trouble with the FDA. But when in a routine inspection of Anodyne's premises the FDA learned more about the product's labeling and marketing, it sent the

company a letter warning it not to market the device as a treatment for peripheral neuropathy as distinct from a treatment for the symptoms of that disease. The difference between marketing a drug or medical device as a treatment for a disease and as a treatment for symptoms is subtle but significant: a drug that reduces fatigue caused by any number of conditions, including leukemia, is not a treatment for leukemia.

But the FDA's ruling did not preclude a physician or other healthcare provider, such as Nightingale, from prescribing the device to patients as a treatment for peripheral neuropathy. For 21 U.S.C. § 396 says that "nothing in this chapter shall be construed to limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed device to a patient for any condition or disease within a legitimate health care practitioner-patient relationship." See *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 350 (2001); *Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 942 (7th Cir. 2001); *In re Gilead Sciences Securities Litigation*, 536 F.3d 1049, 1051 and n. 2 (9th Cir. 2008); *Sigma-Tau Pharmaceuticals, Inc. v. Schwetz*, 288 F.3d 141, 147-48 (4th Cir. 2002). The decision to prescribe such "off-label usage," as it is called, is regarded as a professional judgment for the healthcare provider to make. Nightingale told its patients that the Anodyne device was a treatment for peripheral neuropathy, but as far as appears did not tell them that it had been approved by the FDA as a treatment for that condition.

Yet when Nightingale learned of the warning letter it stopped using the Anodyne devices that it had

bought—though not immediately; several months elapsed before Nightingale, having bought similar devices from a company called MedX Health Corporation, told Anodyne that it was returning the Anodyne devices and wanted its money back. Anodyne refused. Nightingale seeks damages consisting of the purchase price of the Anodyne devices that it tried to return, the expenses that it incurred in retraining its staff to use the MedX devices, and the cost of an advertising campaign in which it had referred to Anodyne's product.

Anodyne's primary defense is the warranty for its devices, a one-year warranty covering defects in material and workmanship which states that it "is in lieu of [all] other warranties." But it also states that "you [the buyer] may have other rights, which vary from state to state. To the extent allowable by applicable law, in no event shall [Anodyne] be liable for any incidental, consequential, special, indirect, punitive or exemplary damages or lost profits from any breach of warranty." Anodyne claims that these disclaimers disclaim liability for fraud. But they don't. They disclaim liability for breach of warranty but reserve other legal rights, which include the right to sue for fraud.

It is true that many courts will enforce a "no reliance" or "disclaimer of reliance" clause, at least against a sophisticated party. Such "clauses serve a legitimate purpose in closing a loophole in contract law" by heading off a suit for fraud used as "a device for trying to get around the limitations that the parol evidence rule and contract integration clauses place on efforts to vary a written

contract on the basis of oral statements made in the negotiation phase," *Extra Equipamentos e Exportação Ltda. v. Case Corp.*, 541 F.3d 719, 724 (7th Cir. 2008)—which is what Nightingale is trying to do.

"[N]o-reliance clauses are called 'big boy' clauses (as in 'we're big boys and can look after ourselves')," and hence in some states are not enforced without "an inquiry into the circumstances of its negotiation, to make sure that the signatory knew what he was doing." *Id*. No such inquiry was conducted here. The enforceability of "big boy" clauses in either Florida (which Anodyne treats as the source of controlling law, without addressing the issue of choice of law, though Nightingale bases its fraud claim on Indiana law and the district court did not question that choice of law) or Indiana is in any event unclear. But there is no need to try to clarify it in this case, because the parties' contract contains no such clause.

The problem with Nightingale's case is profound but lies elsewhere. Nightingale had the expected results with its use of the Anodyne device to treat patients who suffer from peripheral neuropathy; it relieved their symptoms. And there is no suggestion that the MedX device with which it replaced the Anodyne device did any better; for no more than the Anodyne device had it been approved by the FDA for the treatment of peripheral neuropathy. Nightingale has not explained why it decided to replace the Anodyne device with the MedX device. At argument one of us asked Nightingale's lawyer whether the reason might be that his client had represented to its patients that the Anodyne device

had been approved by the FDA for the treatment of peripheral neuropathy and that rather than correct the representations and perhaps frighten its patients it had decided to replace the device. If so, Nightingale may have been committing a fraud against its patients—its lawyer conceded the possibility although we are disinclined to hold her to a concession, made in the heat of argument, that may not have been considered or intended. No matter; she has proposed no motive for Nightingale's precipitate replacement of the Anodyne device—replacement that is the direct or indirect source of the damages it seeks.

We might have a different case had Nightingale been motivated to buy the Anodyne device by a representation that it had been approved by the FDA as a treatment for peripheral neuropathy. But if so it would not have replaced the device with a product, materially identical to Anodyne's, that also had not been approved for such treatment.

Its fraud claim has no merit. There was no material misrepresentation. But for completeness we return to the jurisdictional question with which we began this opinion—whether Nightingale had a good-faith basis for asserting that its damages (which it claimed exceeded $600,000) exceeded the $75,000 threshold for a diversity suit. As the district judge pointed out, Nightingale presented no evidence of damages. The point was repeated with some emphasis in Anodyne's brief in this court, yet Nightingale's reply brief does not mention damages. Nightingale presented evidence about cost—the cost of the Anodyne devices, the cost of its advertising,

and so forth—but cost is not damages. Since the MedX device that replaced Anodyne's device was materially identical, Nightingale's action in replacing it constituted a dramatic failure to mitigate damages.

Ordinarily a failure to prove any damages does not disturb jurisdiction under a statute that sets a damages threshold. The failure is a failure on the merits rather than a failure of jurisdiction. *Hixon v. Sherwin-Williams Co.*, 671 F.2d 1005, 1007 (7th Cir. 1982). But if it is demonstrated that jurisdiction was invoked without a good-faith basis for supposing that the plaintiff crossed the threshold, the case must be dismissed for want of jurisdiction no matter how late in the litigation the lack of a good-faith basis comes to light, e.g., *Gardynski-Leschuck v. Ford Motor Co.*, 142 F.3d 955, 958-59 (7th Cir. 1998); *Charvat v. GVN Michigan, Inc.*, 561 F.3d 623, 628, 632 (6th Cir. 2009); *Jones v. Knox Exploration Corp.*, 2 F.3d 181, 183 (6th Cir. 1993), just as with any other late-discovered absence of subject-matter jurisdiction. E.g., *Williams v. Aztar Indiana Gaming Corp.*, 351 F.3d 294, 300 (7th Cir. 2003); *Cave v. East Meadow Union Free School District*, 514 F.3d 240, 250 (2d Cir. 2008); *Loughlin v. United States*, 393 F.3d 155, 171 (D.C. Cir. 2004). Otherwise federal jurisdiction could be conferred by the defendant's pretending that the plaintiff had alleged in good faith a claim for damages in an amount above the threshold because both parties wanted to be in federal court. Federal subject-matter jurisdiction cannot be conferred by collusion or consent. 28 U.S.C. § 1359; *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982); *Wolff v. Cash 4 Titles*, 351 F.3d 1348, 1357 (11th Cir. 2003).

So clear is Nightingale's failure to have mitigated its damages that it could have had no basis for thinking that its suit satisfied the minimum amount in controversy requirement of the diversity jurisdiction. That is not a criticism, however; for remember that Nightingale filed the suit in an Indiana state court, where there was no such requirement. The suit was removed to the federal district court by Anodyne. When a suit is removed on the ground that it is within the diversity jurisdiction and a question arises whether the amount in controversy requirement has been satisfied, the defendant has the burden of persuading the court that it has been satisfied. *Rising-Moore v. Red Roof Inns, Inc.*, 435 F.3d 813, 815-17 (7th Cir. 2006); *Brill v. Countrywide Home Loans, Inc.*, 427 F.3d 446, 447-48 (7th Cir. 2005). The question *has* arisen in this case—we have raised it, as a court is required to do if it is a question about its subject-matter jurisdiction, since such questions are not waivable; and we have found that the suit is not within the diversity jurisdiction. Ordinarily this would require dismissal of the case, allowing Nightingale to start over in the Indiana court. But by adding a federal claim after removal, Nightingale brought its suit within the federal-question jurisdiction of the district court and its state-law claims within the district court's supplemental jurisdiction, which has no minimum amount in controversy requirement.

The merits judgment in favor of Anodyne is therefore

AFFIRMED.