COURT OF APPEALS
DECISION
DATED AND FILED

February 14, 2023

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP1937**

Cir. Ct. No. 2017PR20

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

---

IN THE MATTER OF THE 2015 VOTING TRUST AGREEMENT FOR CERTAIN SHAREHOLDERS OF MASON COMPANIES, INC.:

NANCY A. SCOBIE, INDIVIDUALLY AND AS TRUSTEE OF THE WILLIAM M. SCOBIE AND NANCY A. SCOBIE REVOCABLE TRUST AND TIMOTHY F. SCOBIE,

    PLAINTIFFS-APPELLANTS-CROSS-RESPONDENTS,

  V.

PATRICK S. SCOBIE AND LORI A. GEISSLER,

    DEFENDANTS-RESPONDENTS,

DANIEL J. HUNT,

    DEFENDANT-RESPONDENT-CROSS-APPELLANT.

---

     APPEAL and CROSS-APPEAL from an order of the circuit court for Chippewa County: STEVEN P. ANDERSON, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1      PER CURIAM.  This lawsuit arises out of a family dispute over a voting trust created in 2015 by the shareholders of Mason Companies, Inc. Nancy A. Scobie and Timothy ("Tim") F. Scobie brought suit against Patrick ("Pat") S. Scobie, Lori A. Geissler, and Daniel ("Dan") J. Hunt[1] for their "orchestrated and unlawful scheme to secure control over the direction and management of [Mason] for their personal benefit" by creating the voting trust "through … misrepresentations, deception and misconduct."  In response, Dan counterclaimed against Nancy and Tim for abuse of process.

¶2      Nancy and Tim appeal from the circuit court's order denying their motion for partial summary judgment on their claims, granting the Defendants' motions for summary judgment, and dismissing Nancy and Tim's claims in their entirety with prejudice.  They present five arguments on appeal: (1) the court erred by granting summary judgment on their claim to void the voting trust because of Pat's misrepresentations; (2) the court erred by concluding that Nancy had no marital property interest in her husband's stock; (3) the voting trust is void for lack of a proper purpose; (4) Pat and Lori breached their fiduciary duties to Tim and Nancy as trustees of the voting trust; and (5) the court erred by allowing costs to the Defendants not authorized by law.  The court also denied Dan's

---

[1] For ease of reading, we will refer to the parties in this appeal and cross-appeal by their first names or a shortened version of their first name as utilized by the parties.  We will also refer to Pat, Lori, and Dan collectively as "the Defendants."

motion for summary judgment on his abuse of process counterclaim, and Dan cross-appeals on that basis.

¶3      We reject the majority of Nancy and Tim's arguments and affirm the circuit court's rulings.  We also affirm the court's dismissal of Dan's abuse of process counterclaim.  On the issue of costs, however, we conclude that this court lacks appellate jurisdiction to consider whether the circuit court erroneously taxed some disbursements not authorized by WIS. STAT. § 814.04(2) (2019-20).[2]

## BACKGROUND

¶4      Mason is a family-run corporation based in Chippewa Falls, Wisconsin, that sells footwear and apparel.  Pertinent to this appeal and cross-appeal, Mason's stock is divided into two classes:  Class A voting shares and Class B nonvoting shares.[3]  The majority of the parties in this dispute—Nancy, Tim, Pat, and Lori—each own a percentage of Class A voting shares in Mason.

¶5      Nancy was married to William ("Bill") Mason Scobie for fifty-two years.  Bill, who died on July 29, 2016, had previously served as Mason's president, CEO, and chairman of the board.  For her part, Nancy never worked at Mason or served on its board of directors.  At the time of his death, Bill owned 34.65% of all outstanding Class A shares, which he inherited from his family members.  Nancy and Bill are Pat and Tim's mother and father, respectively.

---

[2] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

[3] Only Class A shareholders vote to elect Mason's board of directors, who, in turn, appoint Mason's officers and managers.  Mason's shareholders are mostly descendants of the individuals who founded Mason in 1904.

¶6     Pat and Tim each own 25.13% of the outstanding Class A shares of Mason, and they are both attorneys.  Bill and Nancy gifted the brothers their Class A shares in 1993 and between December 2006 and August 2010.[4]  Pat is an estate planning attorney who has been on Mason's board of directors since 2004 and has served as chairman since 2009.  Tim served on the board of directors from 2009 until February 2018 and served as Mason's vice president and general counsel until February 2017.

¶7     Lori is Pat and Tim's cousin.  Lori is vice president of purchasing at Mason, and she has served on the board since 2006.  Lori owns 5.26% of the outstanding Class A shares, which she received as a gift from her mother, one of Bill's sisters.

¶8     Dan is the only party to this dispute who is not a member of the extended Mason family.  In 2004, Dan succeeded Bill as CEO and president of Mason, and he retired in 2019.  Dan has never been a shareholder of Mason.

¶9     The dispute in this case centers around a voting trust agreement executed by Bill, Pat, Tim, and Lori on June 12, 2015 (the "2015 Voting Trust" or the "Agreement").  Nancy was involved in negotiating and drafting the 2015 Voting Trust, but Dan was not.  The Agreement was drafted with the assistance of Attorney Mark Bradley.  Lori was also represented by legal counsel during the negotiations.

---

[4] Nancy and Tim argue that both Bill and Nancy gifted these shares.  As we will explain later, Bill's Class A shares of Mason were his individual property.

4

¶10    The 2015 Voting Trust's purpose, according to its terms, was "to secure continuity and stability of the voting of the shares of stock in the Company contributed by the Shareholders."  Under the Agreement, Bill, Pat, Tim, and Lori each transferred all of their respective Class A shares into the 2015 Voting Trust, which resulted in more than ninety percent of the Class A shares of Mason residing in the 2015 Voting Trust.[5]  Bill, Pat, Tim, and Lori appointed themselves as trustees with exclusive authority to vote the Class A shares.  Nancy was not made a trustee, and the Agreement provided that upon Bill's death, his Class A shares would remain in the 2015 Voting Trust under the control of Tim, Pat, and Lori as the three remaining trustees.  Following Bill's death, however, Bill's beneficial interest in his Class A shares transferred to the William and Nancy Scobie Revocable Trust (the "Bill & Nancy Trust"), which Nancy would control as surviving spouse and successor trustee and beneficiary.  The 2015 Voting Trust's initial term was twelve years, which the majority of trustees could extend for an additional ten years, or until 2037.

¶11    Bill passed away a little over a year after executing the 2015 Voting Trust.  Seven months later, in February 2017, after a vote of Mason's board of directors, Dan terminated Tim as vice president and general counsel of Mason.  The next year, in January 2018, Tim was removed from Mason's board of directors.

---

[5] Bill, Pat, and Tim had previously executed a similar trust agreement in 2006 (the "2006 Voting Trust").  Tim and Pat each contributed the Class A shares they had received from their father into the 2006 Voting Trust, and Bill, Tim, and Pat were made trustees, with the exclusive authority to vote the Class A shares.  Nancy was not a trustee in the 2006 Voting Trust.  On June 12, 2015, Bill, Pat, and Tim terminated the 2006 Voting Trust by executing a "Deed of Termination" in order to transfer those Class A shares into the 2015 Voting Trust.

¶12 Nancy initiated this lawsuit against the Defendants in March 2017, and Tim later joined as a plaintiff. The joint amended petition and complaint sought to void or terminate the 2015 Voting Trust based on five counts and eleven grounds.[6] According to Nancy and Tim, the intended purpose of the 2015 Voting Trust was for the Class A shareholders to work together to develop a consensus and vote the shares "in the same manner." Toward that purpose, Nancy and Tim claim that while discussing how the 2015 Voting Trust would work, Bill asked what would happen if Tim and Pat could not agree on a matter requiring a vote of Class A shares after Bill's death. Pat's response, according to Nancy and Tim, was that Pat and Tim would terminate the 2015 Voting Trust if they could not agree. Nancy and Tim claim, however, that was never Pat's plan. Instead, they assert that Pat and Lori's intention was "to vote the shares to prevent Tim from

---

[6] In Count 1, Nancy and Tim sought a declaration that the 2015 Voting Trust is void based on: (1) the Defendants' "improper or illegal" "hidden purpose … to prevent shareholders from voting their shares in order for [the Defendants] to maintain control of Mason for their own benefit"; (2) fraud as to Nancy's alleged interest in Bill's Class A shares; (3) Bill and Tim not seeing a final version of the 2015 Voting Trust agreement before signing; (4) there being no consideration for the creation of the 2015 Voting Trust; (5) the Defendants fraudulently inducing Bill and Tim to enter into the 2015 Voting Trust; (6) Lori's failure to obtain control over additional shares (owned by another family member) to add to the 2015 Voting Trust; (7) termination of the 2006 Voting Trust being obtained through fraud committed by Pat; and (8) Bill lacking the capacity to execute the 2015 Voting Trust.

In Count 2, Nancy and Tim sought a declaration, in the alternative, that the 2015 Voting Trust should be terminated as it no longer has a legitimate purpose and that any possible legitimate purpose had become impossible or been frustrated. In Count 3, Nancy and Tim argued that to the extent the 2015 Voting Trust is not void, the 2006 Voting Trust's termination should be declared void because Pat obtained termination of that trust through fraudulent representations made to Tim.

In Count 4, Nancy and Tim argued that to the extent the 2015 Voting Trust is not void or terminated, Nancy has the right to appoint a successor trustee for Bill, and they sought a declaration to that effect. Finally, Count 5 of the petition alleged that the Defendants breached their fiduciary duties of loyalty and care to Mason's shareholders and that Pat and Lori, as trustees of the 2015 Voting Trust, also owe fiduciary duties to Nancy and Tim, individually.

exercising any power in the direction of the company, and to ensure their own control over Mason, including security in their own lucrative positions."[7]

¶13     In response to Nancy and Tim's suit, Dan filed a counterclaim alleging abuse of process.  He argued that Nancy and Tim's claims were frivolous, made in bad faith, and filed "as a means to seek revenge against" Dan for his "perceived participation in the termination" of Tim as general counsel and Tim's removal from Mason's board of directors.

¶14     Nancy and Tim moved for partial summary judgment on their claims that the 2015 Voting Trust was void and that it should be terminated.  The Defendants filed cross-motions for summary judgment, seeking dismissal of all of Nancy and Tim's claims.  Dan also moved for summary judgment on his abuse of process counterclaim.

¶15     The circuit court ultimately granted the Defendants' motions and dismissed Nancy and Tim's petition in its entirety and with prejudice. The court concluded that Nancy and Tim had failed to show that "the purpose of the 2015 Voting Trust was to disenfranchise or defraud shareholders" or that the purpose involved anything illegal, unlawful, or improper.  According to the court, the Agreement "was a lawful contract, negotiated with the benefit of experienced legal counsel and sophisticated, intelligent, educated, and fully competent parties, with

---

[7] Section 8.3 of the 2015 Voting Trust provides for proportional voting in cases of disagreement on any issues requiring a vote.  Pursuant to that section, after Bill's death, the remaining trustees—Tim, Pat, and Lori—each have an equal vote.  Thus, Nancy and Tim explain that Pat and Lori currently control Mason, even though they collectively own only about thirty percent of Mason's Class A shares, based on their control of the majority votes in the 2015 Voting Trust.  Nancy and Tim, on the other hand, collectively own nearly sixty percent of Mason's Class A shares, but they "effectively have no vote or ability to elect directors or oversee the management or direction of Mason."

consideration for its creation and execution, and a valid and unambiguous integration clause and a valid and unambiguous non-reliance clause." The court further concluded that the Agreement "should be enforced according to its terms" and without consideration of "[a]ny oral or written representations" "not included in the four corners of the" Agreement that were allegedly made to Bill and Tim to induce them to enter into the 2015 Voting Trust. The court also denied Dan's motion for summary judgment as to his abuse of process counterclaim.

¶16     Nancy and Tim appeal, and Dan cross-appeals. On November 16, 2020, Nancy and Tim filed their notice of appeal from the circuit court's final order entered on October 2, 2020, which granted the Defendants' motions for summary judgment and granted Nancy and Tim's motion for summary judgment on Dan's counterclaim. The October 2 order also generally awarded the Defendants' costs and fees and stated that it was a final order for purposes of appeal. On November 10, 2020, Nancy and Tim objected to the Defendants' Bills of Costs. After a hearing on February 22, 2021, the court entered its Order on Bill of Costs, Taxation and Judgment on April 1, 2021. This order also stated that it was final for purposes of appeal.

## DISCUSSION

¶17     Wisconsin law provides for the creation of voting trusts. Under WIS. STAT. § 180.0730(1),

> [o]ne or more shareholders may create a voting trust, conferring on a trustee the right to vote or otherwise act for them, by signing an agreement setting out the provisions of the trust and transferring their shares to the trustee. The voting trust agreement may include any provision consistent with the voting trust's purpose.

8

A voting trust is one type of structuring device "for maintaining control of a corporation." John J. Woloszyn, *A Practical Guide to Voting Trusts*, 4 U. BALT. L. REV. 245, 245 (1975). "A voting trust is simply a trust of stock which is created when participating stockholders execute a written trust agreement and, pursuant to the agreement, endorse and transfer their stock certificates and the legal title to their shares to a voting trustee." *Id.*

## I. Nancy and Tim's Appeal

¶18    On appeal, Nancy and Tim argue that the circuit court erred by granting summary judgment in the Defendants' favor. We review summary judgment decisions de novo, using the same methodology as the circuit court. *Ehr v. West Bend Mut. Ins. Co.*, 2018 WI App 14, ¶7, 380 Wis. 2d 138, 908 N.W.2d 486. We examine the pleadings and materials submitted by the parties to determine whether there are material facts in dispute that would entitle the party opposing summary judgment to trial. *Palisades Collection LLC v. Kalal*, 2010 WI App 38, ¶9, 324 Wis. 2d 180, 781 N.W.2d 503; WIS. STAT. § 802.08(2). For the reasons that follow, we conclude that the circuit court properly granted summary judgment to the Defendants in this case.

### a. Nancy and Tim Failed to Establish a Claim for Fraudulent Misrepresentation

¶19    First, Nancy and Tim argue that "Bill and Tim Scobie were fraudulently induced into signing the 2015 Voting Trust by Pat's representation that if, after Bill's death, he and Tim could not agree on how to vote the shares, they would terminate the 2015 Voting Trust." According to Nancy and Tim, the circuit court "misinterpreted Pat's representation as contradicting the express terms of the trust when in fact the termination provision" was specifically

modified to allow Tim and Pat to terminate the 2015 Voting Trust under these circumstances.

¶20    In order to void the 2015 Voting Trust based on a fraudulent representation, Nancy and Tim must establish "a false representation made with intent to defraud and reliance by the injured party on the misrepresentation." *See Ritchie v. Clappier*, 109 Wis. 2d 399, 404, 326 N.W.2d 131 (Ct. App. 1982); *see also Williams v. Rank & Son Buick, Inc.*, 44 Wis. 2d 239, 242, 170 N.W.2d 807 (1969). The reliance, however, "must be 'justifiable[,]'" and "[n]egligent reliance is not justifiable." *Ritchie*, 109 Wis. 2d at 404 (citation omitted). "The general rule in Wisconsin, as elsewhere, is that the recipient of a fraudulent misrepresentation is justified in relying on it, unless the falsity is actually known or is obvious to ordinary observation." *Hennig v. Ahearn*, 230 Wis. 2d 149, 170, 601 N.W.2d 14 (Ct. App. 1999) (citing *Williams*, 44 Wis. 2d at 245-47). "Whether the falsity of a statement could have been discovered through ordinary care is to be determined in light of the intelligence and experience of the misled individual. Also to be considered is the relationship between the parties." *Ritchie*, 109 Wis. 2d at 405-06 (quoting *Williams*, 44 Wis. 2d at 246). Where the facts are undisputed, whether the party claiming fraud was justified in relying on a misrepresentation is a question of law. *See id.* at 406.

¶21    Nancy and Tim allege that during negotiations of the 2015 Voting Trust, Attorney Bradley held a conference call with Bill, Nancy, Tim, Pat, and Lori to review the draft agreement. Nancy and Tim allege that during that call, Pat represented that if he and Tim could not agree on how to vote the shares, they would terminate the Agreement. Each shareholder would then vote their own shares, with Nancy voting Bill's shares as trustee of the Bill & Nancy Trust. The

10

next day, Bradley circulated another draft of the 2015 Voting Trust. This draft permitted the 2015 Voting Trust's termination by a *majority* of Trustees instead of *all* Trustees, as was stated in a previous draft. Nancy and Tim assert that based on these representations, the 2006 Voting Trust was terminated, and Bill, Tim, Pat, and Lori ratified the 2015 Voting Trust.

¶22    We agree with the circuit court's determination that Nancy and Tim did not justifiably rely on Pat's alleged representation that he and Tim would terminate the 2015 Voting Trust if they could not agree. For summary judgment purposes, even if we assume, without deciding, that Pat made the alleged representation, we conclude that Nancy and Tim were not justified in relying on Pat's representation, as the express terms of the Agreement contradict his statement.

¶23    First, Section 8.3 of the Agreement, addressing "Proportional Voting Rights," provides:

> Without limiting the discretion of a Trustee, it is the Shareholders' desire that the Trustees seek to vote all shares of stock registered in their names under this Agreement in the same manner. If, however, in the exercise of discretion, the Trustees are not able to vote all such shares in the same manner, then each Trustee shall have the right to vote an equal portion of such shares.

Thus, per the Agreement's plain terms, the trustees are not required to agree. While the Agreement states a "desire" that the trustees vote their shares in the same manner, the Agreement contains no limit on the trustees' ability to exercise independent discretion and judgment and vote accordingly. Nancy and Tim argue, however, that Section 8.3 addresses only how the shares are voted if the 2015 Voting Trust still exists at the time and does not apply if the Agreement is terminated. But that is a distinction without a difference. Section 8.3 does not

11

require that the Agreement be terminated if the parties cannot agree, and while the 2015 Voting Trust still exists, the trustees are not required to vote the shares in the same manner.

¶24     Second, Section 12.1 of the 2015 Voting Trust provides the exclusive terms and conditions for termination of the 2015 Voting Trust.  As pertinent to this appeal, Section 12.1(c) provides that the 2015 Voting Trust will continue until a majority of the trustees executed a declaration of termination. Nancy and Tim argue that the circuit court erred by concluding that Section 12.1 contradicts Pat's representation that they would terminate the 2015 Voting Trust if they could not agree.  Instead, they contend that Section 12.1(c) was included in the Agreement to incorporate Pat's representation to that effect.  Thus, according to Nancy and Tim, Section 12.1(c) allowed Pat and Tim to do exactly what Pat represented that he would do in the event of a disagreement.

¶25     Nancy and Tim's claim is not supported by the Agreement's express language.  Although Section 12.1(c) provides a mechanism for the trustees to terminate the 2015 Voting Trust, the termination procedures contain absolutely no requirement that the 2015 Voting Trust be terminated if the trustees do not agree. In fact, Tim's own testimony confirms that he understood that the 2015 Voting Trust's terms allowed Pat and Lori to outvote him on whether to terminate the Voting Trust and that he knew that Pat was not obligated to vote to terminate the 2015 Voting Trust.

¶26     Nancy and Tim's argument that "Pat's promise was *incorporated into* the termination clause" in Section 12.1(c) is further contradicted by Section 8.3, which provides a very different and specific process for voting disagreements.  The record shows that these two provisions were included in the

draft of the Agreement at the same time and that the terms of both provisions were emphasized in communications to the parties. Had the parties wanted to agree to a mandatory or automatic termination provision in the event of a voting disagreement, they could have written that into the 2015 Voting Trust, but they failed to do so. *See Larchmont Holdings, LLC v. North Shore Servs., LLC*, 292 F. Supp. 3d 833, 862 (W.D. Wis. 2017) (stating that it was not reasonable to rely on representations contrary to contract's explicit language and that "[t]he only logical and reasonable response to oral representations that contradicted written provisions of the contract would have been to insist that the written contract reflect the oral representation").

¶27    Third, Nancy and Tim cannot show justifiable reliance because the 2015 Voting Trust contains unambiguous integration and nonreliance clauses. The integration clause, contained in Article 2 of the Agreement, states that the 2015 Voting Trust "supersedes all prior agreements between the parties relating to its subject matter." The nonreliance clause then confirms that "[t]here are no other understandings or agreements between [the parties] concerning the subject matter." As the circuit court recognized, "an unambiguous merger or integration clause demonstrates that the parties intended the contract to be a final and complete expression of their agreement." *Town Bank v. City Real Est. Dev., LLC*, 2010 WI 134, ¶39, 330 Wis. 2d 340, 793 N.W.2d 476.

¶28    By signing the Agreement, Bill and Tim essentially represented as part of the transaction that they had, in fact, *not* relied on any prior oral statements made by Pat. Tim testified that he understood what the unambiguous integration and nonreliance clauses meant, and Attorney Bradley testified that he did not have "any evidence to suggest that [Bill] failed to appreciate and understand the

13

purpose and effect" of these clauses. Thus, the circuit court properly concluded that Bill and Tim did not justifiably rely upon Pat's representation because Pat's statement was not incorporated into the final version of the 2015 Voting Trust.

¶29 In response, Nancy and Tim claim that the circuit court erred by applying the parol evidence rule to conclude that Bill and Tim could not have reasonably relied on Pat's misrepresentation. The parol evidence rule provides that

> [w]hen the parties to a contract embody their agreement in writing and intend the writing to be the final expression of their agreement, the terms of the writing may not be varied or contradicted by evidence of any prior written or oral agreement in the absence of fraud, duress, or mutual mistake.

*Town Bank*, 330 Wis. 2d 340, ¶36 (citation omitted); *Extra Equip. E Export. Ltda. v. Case Corp.*, 541 F.3d 719, 723 (7th Cir. 2008) ("The rule implements the parties' intention to 'simplify the administration of the resulting contract and to facilitate the resolution of possible disputes by excluding from the scope of their agreement those matters that were raised and dropped or even agreed upon and superseded during the negotiations.'" (citation omitted)). According to Nancy and Tim, "[w]hen determining whether a party committed fraud, the parol evidence rule does not exclude evidence of a misrepresentation which voids the contract. Here, because Nancy and Tim seek to void the contract, rather than enforce it, the parol evidence rule is irrelevant." *See Bank of Sun Prairie v. Esser*, 155 Wis. 2d 724, 731, 456 N.W.2d 585 (1990) ("The parol evidence rule does not exclude evidence to show misrepresentation as a ground for avoidance of the contract."); *Peterson v. Cornerstone Prop. Dev., LLC*, 2006 WI App 132, ¶31, 294 Wis. 2d 800, 720 N.W.2d 716 ("In conjunction with the parol evidence rule, an integration clause generally bars the introduction of extrinsic evidence to 'vary or contradict

the terms of a writing.' Absent claims of duress, fraud, or mutual mistake, integration clauses are given effect." (footnote and citation omitted)); *see also Grube v. Daun*, 173 Wis. 2d 30, 59-60, 496 N.W.2d 106 (Ct. App. 1992), *overruled on other grounds by Marks v. Houston Cas. Co.*, 2016 WI 53, ¶75, 369 Wis. 2d 547, 881 N.W.2d 309 ("Wisconsin follows the general rule that integration clauses which negate the existence of any representations not incorporated into the contract may not be used to escape liability for the misrepresentations.").

¶30 Pat and Lori argue, however, that the circuit court "did not apply or address the parol evidence rule in its [o]rder, so the corresponding accusation of error is unfounded and inappropriate." To be clear, while the court did not specifically reference the "parol evidence rule" in its oral ruling or written order, it did include the *Town Bank* quote referenced above, defining the rule. Thus, to the extent the court relied on the parol evidence rule to reach its conclusion, we conclude that the court properly rejected a claim that Bill and Tim justifiably relied on Pat's representation.

¶31 Here, the integration clause in conjunction with the nonreliance clause clearly express that all prior negotiations between the parties were excluded and that only the text of the 2015 Voting Trust constituted the final agreement. Even if the parol evidence rule is not applicable—as Nancy and Tim suggest— based on their fraudulent misrepresentation claim, the inclusion of the nonreliance clause in the 2015 Voting Trust forecloses Nancy and Tim's argument on this point as it disclaims Bill and Tim's reasonable reliance on Pat's representation. *See Peterson*, 294 Wis. 2d 800, ¶¶36-37 (concluding, in a case alleging a WIS. STAT. § 100.18 claim, that "three different provisions [in the contract] expressed

15

that all prior negotiations were excluded" and that the "[s]eller has made no representations other than written in this offer" and therefore the provisions "disclaim[ed] the purchaser's right to rely on any alleged fraudulent misrepresentations"); *see also* **Extra Equip.**, 541 F.3d at 723-24 (explaining that "[t]he parol evidence rule is a rule of contract law" and where "the claim of fraud is based on statements made in a negotiation that resulted in a contract … a suit for fraud can be a device for trying to get around the limitations that the parol evidence rule and contract integration clauses place on efforts to vary a written contract on the basis of oral statements made in the negotiation phase" and therefore "[n]o-reliance clauses serve a legitimate purpose in closing a loophole in contract law"). As noted above, the evidence suggests that the parties to the Agreement understood the significance of the nonreliance clause. *See Nightingale Home Healthcare, Inc. v. Anodyne Therapy, LLC*, 589 F.3d 881, 885 (7th Cir. 2009). Therefore, the circuit court did not err.

¶32 Finally, we conclude that the circumstances surrounding the transaction do not support a claim for justifiable reliance on the alleged misrepresentation. Nancy and Tim argue that the circuit court erred by "ignoring the family dynamics and history of unified cooperation between Tim and Pat" and "Bill's poor health." We disagree. The 2015 Voting Trust was the product of a month-long negotiation, involving five circulated drafts. It is undisputed that in negotiating the Agreement, the parties were either represented by legal counsel or, in the case of Pat and Tim, were attorneys themselves. The parties were all sophisticated individuals, and we are not convinced that a family relationship between the parties would erase their collective legal knowledge and experience or business acumen. Further, while it is clear from the record that Bill's health was

16

failing, the record also reveals that Bill was mentally competent when he negotiated and agreed to the terms of the 2015 Voting Trust.

¶33    Given these circumstances, even if Bill and Tim had initially believed Pat's representation that the 2015 Voting Trust would be terminated if Pat and Tim could not agree, based on the express terms of the Agreement, coupled with their legal representation and experience, it would have been obvious to Bill and Tim that the Agreement did not actually require termination under those circumstances.  Thus, any reliance on Pat's representation was not justifiable as a matter of law.

### b. Nancy Had No Marital Interest in Bill's Stock

¶34    Nancy and Tim next argue that the "2015 Voting Trust is also void for the lack of Nancy's consent to the Agreement and transfer of shares to the Trust as she held an undivided one-half interest in Bill's Class A shares of Mason stock."  Therefore, they claim, "[b]ecause the Trustees knew Nancy held a marital property interest in Bill's Class A shares, the trust cannot obtain them free from Nancy's interest."  According to Nancy and Tim, the circuit court erred by concluding that Nancy had no marital property interest in Bill's Class A shares.

¶35    In reaching its conclusion that Nancy had no marital property interest in the Class A shares, the circuit court relied on estate planning documents prepared by Bill and Nancy with the assistance of counsel.  It is undisputed that Bill's Class A shares were inherited from his family members.  On March 1, 1999, Bill and Nancy executed the Bill & Nancy Trust, which was restated in its entirety on February 13, 2015.  The Bill & Nancy Trust documents classified Bill's

17

Class A shares as Bill's individual property. Further, in 2006, Bill and Nancy executed a Marital Property Agreement ("MPA"). That agreement provided that

> [a]ny gift or inheritance received from a third party before or after this agreement is signed shall be classified as the individual property of the party receiving it. If a party mixes marital property together with the property received by gift or inheritance, any individual property so mixed shall be reclassified as marital property unless the component of the mixed property that is individual property can be traced. The parties recognize that individual gift or inherited property acquired before or after this agreement is executed must be segregated and not irretrievably mixed with marital property if the individual property is to remain individual property.

In her deposition, Nancy agreed that the MPA established that Bill's Class A shares were his individual property, not marital property.

¶36 On appeal, Nancy and Tim do not appear to dispute that the plain terms of the MPA provide that Bill's Class A shares were classified as his individual property. Nancy and Tim argue, however, that the circuit court's conclusion "ignores what transpired *after* Bill and Nancy executed the [MPA]," which is that Bill and Nancy treated the Class A shares as marital property owned by each of them. Bill's donative intent is demonstrated, according to Nancy and Tim, by Bill and Nancy "each, individually, gift[ing] Class A shares to Tim and Pat." Notably, both Bill and Nancy filed United States Gift Tax Return, Form 709 ("Form 709"), each individually gifting the same number of Class A shares to both Tim and Pat.

¶37 We conclude that the circuit court did not err by determining that Nancy had no marital property interest in Bill's Class A shares; therefore, Nancy's consent to transfer the stock to the Voting Trust was not required, and the 2015 Voting Trust is not void. Whether Bill's Class A shares are classified as marital or

individual property requires us to apply marital property law to undisputed facts, which is a question of law that we review de novo. *See Bille v. Zuraff*, 198 Wis. 2d 867, 874-75, 543 N.W.2d 568 (Ct. App. 1995).

¶38 As noted, it is undisputed that under Bill and Nancy's 2006 MPA, the Class A shares were classified as Bill's individual property. This classification is supported by WIS. STAT. § 766.31(7)(a), which provides that property received as a gift or by inheritance is individual property. Nevertheless, as Bill and Nancy recognized in their MPA, a spouse may voluntarily reclassify his or her individual property to marital property, including by gift, conveyance, and marital property agreement. *See* § 766.31(10). Reclassification of property can also be accomplished pursuant to the mixed property provisions of WIS. STAT. § 766.63(1).

¶39 In this case, there is no evidence that Bill reclassified his Class A shares by gift, conveyance, or by mixing the shares with marital property. Nancy and Tim fail to specify under which method they claim that reclassification occurred. While Nancy and Tim argue that Bill reclassified *all* of his shares as marital property by gifting some of them to Pat and Tim with Nancy, we fail to see how the act of gifting the shares to his sons was either a reclassification by gift, as the gift was not to Nancy, or was a mixing of the gifted shares with marital property. Even if, as the circuit court postulated, Bill had "gift[ed] [the shares] to Nancy to … make them marital property" for tax liability purposes and then gifted those shares to Tim and Pat from both Bill and Nancy, that exchange did not affect the other shares of Class A stock that Bill retained. Further, we agree with the court that Form 709 could not, by itself, transform the remaining Class A shares

from individual to marital property, and Bill did not take any additional independent action to reclassify his stock.

¶40    In reply, Nancy and Tim argue that Bill and Nancy's MPA "varied the effects of WIS. STAT. § 766.31(10) with respect to the reclassification of individual property as marital property" because the MPA "provides that inherited individual property shall be *reclassified* as marital property if it is mixed or treated as marital property." First, as explained above, the Class A stock that Bill retained was not "treated as marital property." Further, to the extent that Nancy and Tim attempt to argue that the shares were mixed with marital property, they fail to quote the remaining portion of that sentence in the MPA, which states that "any individual property so mixed shall be reclassified as marital property *unless the component of the mixed property that is individual property can be traced*." (Emphasis added.) The individual status of Bill's Class A shares can easily be traced, and Nancy and Tim do not argue to the contrary. Therefore, the circuit court did not err by concluding, as a matter of law, that Nancy had no marital property interest in Bill's Class A shares, and the 2015 Voting Trust is not void on that ground.

### c.  *The 2015 Voting Trust Is Not Void for a Lack of a Proper Purpose*

¶41    Nancy and Tim next argue that the 2015 Voting Trust is void for lack of a proper purpose. According to Nancy and Tim, the 2015 Voting Trust was established "to accomplish an improper, hidden purpose," which was to "secur[e] control [of Mason] for a minority group of shareholders." Further, Nancy and Tim argue that any possible legitimate purpose of the 2015 Voting Trust—"the Trustees voting together and presenting a unified front to the rest of the family and Company shareholders"—has been frustrated.

¶42 We conclude that the circuit court properly determined that the 2015 Voting Trust had a proper purpose. As noted, voting trusts are permitted by Wisconsin law. *See* WIS. STAT. § 180.0730(1). Under that statute, the only provision addressing the purpose of a voting trust states: "The voting trust agreement may include any provision consistent with the voting trust's purpose." *Id.* The court found that the 2015 Voting Trust contained a statement of purpose in Article 1(B): "[T]o secure continuity and stability of the voting of the shares of stock in the Company contributed by the Shareholders." *See* 5 FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 2081 (Sept. 2022) ("The purpose that determines the validity or invalidity of a voting trust agreement is the purpose that the instrument itself discloses."). As the court noted in its decision, testimony from Attorney Bradley, who drafted the Agreement, and testimony from the parties revealed that the purpose stated in Article 1(B) represented the agreed-upon purpose of the 2015 Voting Trust.

¶43 Nancy and Tim argue, however, that "the purpose stated in the trust instrument itself … is not a purpose in and of itself" and that "any analysis of the trust's purpose [must] go beyond the language in the agreement," "creating a factual dispute that cannot and should not be resolved at summary judgment." Nancy and Tim provide no legal support for their conclusory assertion that the stated purpose of the 2015 Voting Trust is "not a purpose in and of itself." In fact, as the Defendants identify, courts in other jurisdictions have found stability and continuity of management to be a legitimate purpose of a voting trust. *See, e.g.*, FLETCHER, *supra*, at § 2081 (collecting cases); Woloszyn, *supra*, at 248 ("Use of the voting trust to [e]nsure stability and continuity of management, especially successful management, has been held to be a proper purpose.").

¶44    Nancy and Tim next claim that even if ensuring continuity of management and stability of voting are valid purposes, the 2015 Voting Trust's hidden "true purpose, undisclosed at the time of execution, was for Pat and Lori to secure control of Mason for themselves and leav[e] Tim (and Nancy) out in the cold." We agree with the circuit court's conclusion that "[t]here is no evidence whatsoever that the purpose of the 2015 Voting Trust was to defraud or disenfranchise shareholders" and that Nancy and Tim failed "to establish any legal or factual support for the idea that the 2015 Voting Trust should be voided on public policy grounds."

¶45    According to Nancy and Tim, the Defendants "admitted, on multiple occasions, the purpose of the 2015 Voting Trust was to (1) prevent Nancy from voting Mason Class A shares, and (2) prevent Nancy and Tim from voting for directors who would change Mason's management team (including [Dan's] removal and/or removal of Tim from the Board)." However, it was not hidden or a secret that the terms of the 2015 Voting Trust prevented Nancy from voting Bill's Class A shares in the event of his death, as Nancy testified that this result had been discussed. Further, it was not hidden or secret that, as the Defendants put it,

> part of the purpose of securing continuity and stability of the voting of the shares of stock meant endeavoring to counsel against and prevent Tim or Nancy from taking actions that would endanger the company and the shareholders' best interests, including Tim or Nancy pursuing so-called "nuclear options" such as immediately firing [Dan] or replacing the majority or totality of the Board.

As the record demonstrates, these issues were addressed by Pat, and his concerns were discussed with Tim and Lori prior to creating the 2015 Voting Trust. And, finally, as addressed above, it was not hidden or a secret that the plain terms of the

Agreement did not require the trustees to agree or vote in the same manner; thus, it was clear that Tim could be outvoted.

¶46     Finally, Nancy and Tim argue that even if the 2015 Voting Trust had a legitimate purpose, any purported purpose has now been frustrated. They claim that "[t]he only possibly legitimate purpose found in the trust instrument" was that the trustees vote together and provide a unified front, and since the trustees are no longer voting together, that purpose is now impossible. Nancy and Tim also observe that if the purpose of the 2015 Voting Trust was to prevent board members from firing Dan, that purpose can no longer be fulfilled, as Dan has since retired.

¶47     We agree with the circuit court's conclusion that Nancy and Tim failed to present sufficient evidence to raise a genuine issue of material fact as to whether the purpose of the 2015 Voting Trust has become impossible, been frustrated, or is no longer operative. As noted previously, the 2015 Voting Trust was created for continuity and stability, not to ensure that the trustees vote in the same manner. Further, while replacing Dan was discussed, no evidence has been presented that preventing Nancy and Tim from firing Dan was an actual *purpose* of the 2015 Voting Trust. Thus, there is no support for a conclusion that Dan's retirement frustrated that purported purpose. For these reasons, the court did not err by determining that Nancy and Tim failed to establish that the 2015 Voting Trust had an improper purpose.

#### d. Pat and Lori Did Not Breach Their Fiduciary Duties

¶48 Nancy and Tim next argue that the circuit court erred by concluding that Pat and Lori did not breach their fiduciary duties as trustees.[8] Nancy and Tim claim that, in general, trustees owe fiduciary duties to their principal, including the duties of care and loyalty. *See Zastrow v. Journal Commc'ns, Inc.*, 2006 WI 72, ¶¶28-29, 291 Wis. 2d 426, 718 N.W.2d 51; FLETCHER, *supra*, at § 2091.10 ("Voting trustees should be held to adhere to the usual fiduciary principles of a trust.").[9] Whether there has been a breach of a fiduciary duty is a question of law that we review independently. *See Jorgensen v. Water Works*, *Inc.*, 2001 WI App 135, ¶8, 246 Wis. 2d 614, 630 N.W.2d 230.

¶49 "A corporate officer or director is under a fiduciary duty to act in good faith and to deal fairly in the conduct of all corporate business," which extends "to the corporation, itself, and to its shareholders." *Reget v. Paige*, 2001 WI App 73, ¶12, 242 Wis. 2d 278, 626 N.W.2d 302. Relying on our supreme court's discussion in *Rose v. Schantz*, 56 Wis. 2d 222, 228-29, 201 N.W.2d 593 (1972) (a claim based on alleged wrongs committed against a corporation by its directors and officers belongs to the corporation itself, not the individual shareholders), the circuit court concluded that Nancy and Tim's allegations that the Defendants "breached fiduciary duties as Directors and Officers of [Mason]

---

[8] Although Nancy and Tim's petition originally alleged a claim for breach of a fiduciary duty against Dan as well, Nancy and Tim do not appear to contest the circuit court's grant of summary judgment on this claim as it pertains to Dan.

[9] Pat and Lori argue, in contrast, that the Wisconsin Trust Code does not apply to "voting trust[s]." *See* WIS. STAT. § 701.0102(8). Nancy and Tim respond that § 701.0102(8) is "irrelevant" because their arguments do not rely on WIS. STAT. ch. 701 and are instead "grounded in the common law of trusts."

are claims that would belong to [Mason], and are not individual claims of either Nancy and/or Tim that either Nancy and/or Tim have standing or authority to assert on [Mason's] behalf." The majority of the allegations in Nancy and Tim's petition regarding breach of a fiduciary duty appear to be claims pertaining to Mason's management. *See* **Reget**, 242 Wis. 2d 278, ¶¶12-13; **Jorgensen**, 218 Wis. 2d at 776-77. To the extent that Nancy and Tim state a claim on Mason's behalf, we agree with the court that the claim would belong to Mason; therefore, the court correctly concluded that this claim was a derivative shareholders' claim, and Nancy and Tim had no standing to bring it.

¶50 On appeal, Nancy and Tim claim that Pat and Lori, in their roles as trustees under the 2015 Voting Trust, breached their fiduciary duties to Nancy and Tim individually. According to Nancy and Tim, Pat's and Lori's conduct contravened their duties as fiduciaries because they acted in their own self-interest by using trust property for their own purposes. In particular, Nancy and Tim allege that Pat and Lori "schem[ed] to deprive Nancy and Tim of the voting rights on their Class A shares for their own personal benefit," and, further,

> [t]heir misappropriation of Nancy's marital property, misrepresentations made to Bill and Tim (and Nancy), wrongful termination of Tim and his subsequent removal from the Mason board, and other actions designed to secure control of Mason for themselves, were done in their own self-interest and are certainly not in the interest of Tim and Nancy.

¶51 To the extent that any of Nancy and Tim's claims are not derivative shareholders' claims, we conclude that the circuit court did not err by determining the undisputed facts show that Pat and Lori did not breach any fiduciary duties

owed to Nancy or Tim in their roles as trustees.[10]  In order to bring individual claims for breach of fiduciary duty, Nancy and Tim's petition needed to "allege facts sufficient, if proved, to show an injury that is personal to [them]," as well as "show that each defendant had a fiduciary duty to [Nancy and Tim] in respect to corporate affairs and that the conduct alleged in [Nancy and Tim's petition], as to each defendant, constitutes a breach of that duty."  *See **Reget***, 242 Wis. 2d 278, ¶12; *see also **Rose***, 56 Wis. 2d at 228.

¶52    The circuit court properly concluded that "[t]he only fiduciary duties that the Trustees of the 2015 Voting Trust have are those set forth in [S]ection 8.2 of the 2015 Voting Trust itself," which unambiguously established that the trustees would not be personally liable under the Agreement.  Section 8.2 of the 2015 Voting Trust states:

> In voting the shares of stock registered in their names under this Agreement, the Trustees, either in person or by their nominees or proxies, shall exercise their best judgment to select suitable directors of the Company, and shall otherwise, insofar as they may as Shareholders of the Company, take such part or action in respect to the management of its affairs as they may deem necessary so as to be kept advised on the affairs of the Company and its management.  In voting upon any matter that may come before them at any Shareholders' meeting, the Trustees shall exercise like judgment.  The Trustees, however, shall not be personally liable for any action taken pursuant to their vote or any act committed or omitted to be done under this Agreement, provided that such commission or omission does not amount to willful misconduct on their part and that they at all times exercise good faith in such matters.

---

[10] We will assume, without deciding, that Nancy had standing to bring this breach of fiduciary duty claim, even though she was not a party or signatory to the 2015 Voting Trust and had no marital property interest in Bill's Class A stock.

¶53 The undisputed facts demonstrate that Pat and Lori did not take any action that would violate the 2015 Voting Trust. As previously addressed, Nancy was not deprived of her voting rights in Bill's Class A shares because she had no such voting rights pursuant to the terms of the Agreement. Tim was also not deprived of his voting rights given that Pat and Lori complied with the terms and provisions for voting pursuant to Section 8.3 of the Agreement. Further, pursuant to the terms of the 2015 Voting Trust, Pat and Lori were authorized and empowered to vote to remove members of the board, if that was an action they deemed appropriate. As Attorney Bradley testified, there was nothing improper or illegal under the terms of the 2015 Voting Trust about Pat and Lori voting to remove Tim from the board.

¶54 Finally, as to Pat's alleged representation during the 2015 Voting Trust negotiations—i.e., that Pat and Tim would terminate the Agreement in the event of a dispute—we conclude that even assuming Pat made this statement, he did not breach a fiduciary duty to Tim and Nancy by doing so. As an initial matter, we question whether Nancy and Tim have a claim for breach of a duty of loyalty occurring during those negotiations, as any duty of loyalty was owed to them per the Agreement, and Pat's alleged representation occurred prior to its signing. To the extent that Pat and Lori may have owed a fiduciary duty to Bill, Nancy, and Tim separate from the 2015 Voting Trust, as we concluded above, Bill, Nancy, and Tim could not have reasonably relied on Pat's alleged representation given the terms of the 2015 Voting Trust and the circumstances of the negotiations. In summary, Nancy and Tim have failed to offer any evidence showing the existence of a genuine issue of material fact on their breach of a fiduciary duty claim. Accordingly, the circuit court properly granted summary judgment on this issue.

> *e. This Court Lacks Appellate Jurisdiction to Consider Whether the Circuit Court Erred by Awarding as Costs to Pat and Lori Disbursements for Legal Fees and Expenses for Preparing for and Attending Depositions and for Document Production*

¶55 Finally, Nancy and Tim argue on appeal that the circuit court erred by awarding costs not authorized by law.[11] Although none of the parties challenged our appellate jurisdiction as to this issue, we entered an order on November 30, 2022, questioning whether we possessed jurisdiction to address a challenge to the award of costs and disbursements and requesting supplemental letter briefs on the issue. *See **McConley v. T.C. Visions, Inc.***, 2016 WI App 74, ¶4, 371 Wis. 2d 658, 885 N.W.2d 816 ("It is the duty of this court, notwithstanding the fact that no party has raised the issue, to take notice of its jurisdiction and dismiss an appeal if taken from a nonappealable order.").

¶56 Nancy and Tim do not challenge *whether* respondents should be awarded costs, which the circuit court granted in its October 2, 2020 order, except to argue generally that summary judgment was improperly granted in the Defendants' favor and that a contrary finding would render them no longer the prevailing party and thus not entitled to costs. As we explained above, however, the court properly granted summary judgment. Instead, Nancy and Tim object to

---

[11] As the circuit court granted summary judgment to the Defendants, our statutes mandate an award of their costs. *See* WIS. STAT. § 814.03(1); ***Taylor v. St. Croix Chippewa Indians***, 229 Wis. 2d 688, 696, 599 N.W.2d 924 (Ct. App. 1999). The authority of the court to award costs to the prevailing party is governed by WIS. STAT. § 814.04. The award of costs may include attorney fees, certain specified costs, and "[a]ll the necessary disbursements and fees allowed by law." Sec. 814.04(1), (2).

the court's allowance of certain costs under WIS. STAT. § 814.04(2),[12] which were awarded in the court's April 1, 2021 order. Thus, Nancy and Tim seek our review of the court's April 1, 2021 order, which did not exist when they filed their notice of appeal on November 16, 2020. Nancy and Tim did not file a separate notice of appeal from the April 1, 2021 final order.

¶57 Based on our review of the parties' letter briefs and the record on appeal, we conclude that we do not have jurisdiction to consider an appeal from the April 1, 2021 order. First, all parties correctly agree that the October 2, 2020 order was final for purposes of appeal. *See **Admiral Ins. Co. v. Paper Converting Mach. Co.***, 2012 WI 30, ¶33 & n.13, 339 Wis. 2d 291, 811 N.W.2d 351 ("Longstanding Wisconsin law provides that the pendency of a claim for attorney fees under a fee-shifting statute does not affect the finality of a judgment that disposes of the matter in litigation."); ***Leske v. Leske***, 185 Wis. 2d 628, 633, 517 N.W.2d 538 (Ct. App. 1994) (same); *see also **Harder v. Pfitzinger***, 2004 WI 102, ¶17 & n.8, 274 Wis. 2d 324, 682 N.W.2d 398.

¶58 Nancy and Tim argue that they should not have had to bring a second, separate appeal after the April 1, 2021 order was entered. They claim that this court

> should hold that an appeal from a final appealable order that includes an award of costs and fees necessarily incorporates the later-filed order which actually identifies

---

[12] The circuit court awarded costs and disbursements to Pat and Lori in the amount of $109,837.49. On appeal, Nancy and Tim argue that there is no statutory basis for the court's allowance of $76,023.45 of those costs, as this amount includes payments for legal services rendered for nonparties as well as for document collection and production. In addition to the nonparties' legal fees, Nancy and Tim also challenge expenses for "attendance fees" paid to the court reporting service, which were in addition to the transcription charges, and "video services" for "digitizing and transcript synchronization, video exhibits, and media and cloud services."

> which costs will be granted and the amount of costs and fees, even if that later-filed order is entered well after the notice of appeal is filed.

However, Nancy and Tim do not cite any case law in support of this proposition, arguing only that a contrary finding would result in multiple or piecemeal appeals, which is discouraged.

¶59 We conclude that relevant authority supports the filing of separate appeals in this context. *See, e.g.*, **McConley**, 371 Wis. 2d 658, ¶10; **Kenosha Pro. Firefighters, Local 414 v. City of Kenosha**, 2009 WI 52, ¶15, 317 Wis. 2d 628, 766 N.W.2d 577 ("A final judgment or final order pertaining to fees or costs may be appealed separately from any appeal of the merits of the underlying dispute."); **Laube v. City of Owen**, 209 Wis. 2d 12, 15-16, 561 N.W.2d 785 (Ct. App. 1997); **ACLU v. Thompson**, 155 Wis. 2d 442, 448, 455 N.W.2d 268 (Ct. App. 1990), *overruled on other grounds by* **Edland v. Wisconsin Physicians Serv. Ins. Corp.**, 210 Wis. 2d 638, 563 N.W.2d 519 (1997) (multiple appeals may occur whether attorney fees are awarded before entering judgment or after an appeal).

¶60 In *McConley*, for example, this court specifically recognized the possibility of "multiple appeals" and that "[i]n some cases a second appeal will be taken from a determination of the attorney fee issue." *McConley*, 371 Wis. 2d 658, ¶10. We explained that "[c]onsolidation of related appeals is permitted under WIS. STAT. RULE 809.10(3)" and that "[i]t may also be appropriate to request a stay of appellate proceedings when an attorney fee claim is being actively litigated in the circuit court and the appeal has been filed from the final judgment or order disposing of the litigation." *McConley*, 371 Wis. 2d 658, ¶10 n.6. Ultimately, we concluded that "[a]lthough our preference is to have attorney fee disputes decided before an appeal is taken from the final order or judgment disposing of the

litigation so that all issues are within one appeal, our preference does not dictate our jurisdiction under WIS. STAT. § 808.03(1)." *McConley*, 371 Wis. 2d 658, ¶11.

¶61 Accordingly, we refuse Nancy and Tim's request to conclude that their appeal from the October 2, 2020 order incorporated the April 1, 2021 order entered after their notice of appeal was filed. *See State v. Jacobus*, 167 Wis. 2d 230, 233-34, 481 N.W.2d 642 (Ct. App. 1992) ("[A]n appeal from a judgment does not embrace an order entered after judgment."); *Schlichting v. Schlichting*, 15 Wis. 2d 147, 160, 112 N.W.2d 149 (1961) (concluding a defendant's appeal was "only from the judgment" and a notice of appeal "does not bring before [the court] for review any order entered subsequent to the judgment"). Because Nancy and Tim never filed a notice of appeal from the circuit court's April 1, 2021 order, *see* WIS. STAT. RULE 809.10(1)(b)2., we lack appellate jurisdiction to consider their challenge to that order.

## II. Dan's Cross-Appeal

¶62 In his cross-appeal, Dan argues that the circuit court erred by not allowing his counterclaim for abuse of process to proceed to trial. He asserts that the record developed below, viewed in a light most favorable to him, supports an inference that Nancy and Tim possessed an ulterior motive for including him as a defendant in this lawsuit. Nancy and Tim were aware that Dan was not a party to the 2015 Voting Trust, and, according to Dan, Nancy and Tim's only claim against Dan—the breach of a fiduciary duty claim—involved both improper plaintiffs and improper defendants. Thus, he contends, the record is clear that the only reason for Nancy and Tim to bring a frivolous claim against him was for an improper purpose: harassment, embarrassment, and forcing him out of his position as company president.

¶63     "The tort of abuse of process is a vague, yet simple, concept": "One who uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed, is subject to liability to the other for harm caused by the abuse of process." *Schmit v. Klumpyan*, 2003 WI App 107, ¶6, 264 Wis. 2d 414, 663 N.W.2d 331 (citation omitted).  There are two elements to an abuse of process claim. *Id.*, ¶7.  The first is a "wilful act in the use of process not proper in the regular conduct of the proceedings."  *Id.* (citation omitted).

> This element requires evidence of "some definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process … and there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions."

*Id.* (citation omitted).

¶64     The second element is "a subsequent misuse of the process." *Id.*, ¶8. "This element requires evidence of 'coercion to obtain a collateral advantage, not properly involved in the proceeding itself,' or of use of the process 'to effect an object not within the scope of the process,' or of any other improper purpose." *Id.* (citation omitted).  In other words, the process must be "used to obtain a collateral advantage," which is important "because the tort is characterized as an attempt to use process as a means of extortion." *Id.*, ¶9.  However, "[t]he instigator's personal like or dislike of the target of the process is not relevant"; "there is no action for abuse of process when the process is used for the purpose for which it *is intended*, but there is an incidental motive of spite." *Id.*, ¶11 (citation omitted).

¶65     Tim and Nancy argue that Dan failed to identify any evidence supporting either of the above elements, and the circuit court properly dismissed

Dan's claim. We agree with the court's conclusion that Dan provided no evidence to support his claim that the purpose of Nancy and Tim's lawsuit was to "induce [Dan] to do anything collateral to the lawsuit." While there is no question that Dan retired from his positions with Mason during the pendency of this suit, we agree with the court that there is no evidence that the purpose of Nancy and Tim's claim against Dan was to induce or extort Dan to take collateral action—i.e., force him to retire.

¶66 Dan makes two arguments on appeal. First, he argues that his abuse of process claim should be allowed to continue because Nancy and Tim's claim against him was legally baseless from the beginning. This argument is without merit. First, it is undermined by the circuit court's denial of Dan's initial motion to dismiss Nancy and Tim's joint amended petition and complaint, which illustrated that the court did not believe that Nancy and Tim's claims were baseless. Second, as noted above, the established law regarding an abuse of process claim requires more than a party merely being ultimately unsuccessful on any of their claims: "The existence of an improper purpose alone is not enough, for this improper purpose must also culminate in an actual misuse of the process to obtain some ulterior advantage." *See id.*, ¶7 (citation omitted). No such misuse of process occurred here as Dan fails to prove any ulterior advantage Tim and Nancy gained through pursuit of this lawsuit.

¶67 Dan's second argument is that the record is full of "[d]ocumentary evidence manifesting … animosity, threats, and plans to harm" him and that Nancy and Tim both desired that Dan be removed from Mason. The circuit court agreed, concluding that "the uncontroverted evidence is that there was some dispute between [Dan] and [Tim,] that their dissatisfaction with each other was

33

mutual, and that [Dan] may have advised or counseled [Pat] and Lori or other board members that [Tim] should be terminated from his position with the company." While we agree with the court that based on this record there was clear animosity between the parties, as noted above, "personal like or dislike of the target of the process is not relevant." *See id.*, ¶11. Dan has not presented sufficient evidence—relying instead on speculation and conclusory statements—to suggest that Nancy and Tim did anything other than act consistently with the prosecution of a civil lawsuit, regardless of the feelings between the parties. *See* ***Thompson v. Beecham***, 72 Wis. 2d 356, 364, 241 N.W.2d 163 (1976) ("[P]roof of the existence of an improper motive does not dispense with the necessity of proof of some definite act or threat not properly authorized by the process."). Consequently, the court properly granted summary judgment to Nancy and Tim on Dan's abuse of process claim.

¶68 No costs are awarded to any party.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.